769 So.2d 974 (2000)
Marc James ASAY, Appellant,
v.
STATE of Florida, Appellee.
No. SC90963.
Supreme Court of Florida.
June 29, 2000.
As Modified on Denial of Rehearing October 26, 2000.
*975 Gregory C. Smith, Capital Collateral Counsel, Northern Region, and Heidi Brewer, Assistant CCRC, Northern Region, Tallahassee, Florida; Rachel E. Fugate and Gregg D. Thomas of Holland & *976 Knight LLP, Tampa, Florida; and Stephen F. Hanlon, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, Richard B. Martell, Chief, Capital Appeals, and Curtis M. French, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
Marc James Asay, an inmate under sentence of death, appeals the trial court's denial of his motion for postconviction relief filed pursuant to Florida Rules of Criminal Procedure 3.850 and 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm.

BACKGROUND
Asay was convicted and sentenced to death for the July 17, 1987, murders of Robert Lee Booker and Robert McDowell. On direct appeal, this Court summarized the facts of the crime as follows:
According to testimony of Asay's brother, Robbie, and Robbie's friend, "Bubba" McQuinn [O'Quinn], on July 17, 1987, the three met at a local bar where they drank beer and shot pool. They left the bar around 12:00 a.m. and went to a second bar where they stayed until closing at 2:00 a.m. Although Asay drank a number of beers, both Bubba and Robbie testified that Asay did not appear drunk or otherwise impaired.
After the bar closed, Robbie said he wanted to try to "pick up a girl" he had seen at the bar, so Bubba and Asay drove around the corner in Asay's truck. They returned to discover that Robbie had been unsuccessful with the girl he had seen, so Bubba suggested that they go downtown to find some prostitutes and he would pay for oral sex for them all. Asay and Bubba left in Asay's truck and Robbie left in his. Once downtown, Asay and Bubba soon spotted Robbie who was inside his truck talking to a black man, Robert Lee Booker. Robbie was telling Booker who was standing at the driver's side window of Robbie's truck that he and his friends were looking for prostitutes.
After spotting Booker standing by Robbie's truck, Asay told Bubba to pull up next to the truck. Asay immediately got out of his truck, proceeded to Robbie's truck, and told Robbie "You know you ain't got to take no s__t from these f___ing niggers." Although Robbie told Asay that "everything is cool," Asay began to point his finger in Booker's face and verbally attack him. When Booker told him "Don't put your finger in my face," Asay responded by saying "F__k you, nigger" and pulling his gun from his back pocket, shooting Booker once in the abdomen. Booker grabbed his side and ran. According to the medical examiner, the bullet perforated the intestines and an artery causing internal hemorrhaging. Booker's body was later found under the edge of a nearby house.
Robbie drove away immediately after the shooting. Asay jumped into the back of his truck, as Bubba drove off. When Asay got into the cab of the truck, Bubba asked him why he shot Booker. Asay responded, "Because you got to show a nigger who is boss." When asked if he thought he killed Booker, Asay replied, "No, I just scared the s__t out of him."
Bubba testified that after the shooting, Asay and Bubba continued to look for prostitutes. According to Bubba, he saw "Renee" who he knew would give them oral sex. It appears that at the time neither Bubba nor Asay was aware that "Renee" was actually Robert McDowell, a black man dressed as a woman. According to Bubba, he negotiated a deal for oral sex for them both. Bubba drove the truck into a nearby alley. McDowell followed. Bubba testified that McDowell refused to get into the truck with them both, so Asay left *977 the truck and walked away to act as a lookout while Bubba and McDowell had sex. As McDowell started to get into the truck with Bubba, Asay returned, grabbed McDowell's arm, pulled him from the truck and began shooting him. McDowell was shot six times while he was backing up and attempting to get away. Asay jumped back in his truck and told Bubba to drive away. When asked why he shot McDowell, Asay told Bubba that he did it because "the bitch had beat him out of ten dollars" on a "blow job." McDowell's body was found on the ground in the alley soon after the shots were heard. According to the medical examiner, any of three wounds to the chest cavity would have been fatal.
Asay later told Charlie Moore in the presence of Moore's cousin, Danny, that he shot McDowell because McDowell had cheated him out of ten dollars on a drug deal and that he had told McDowell, "if he ever got him that he would get even." Asay told Moore that he was out looking for "whores," when he came across McDowell. According to Moore's cousin, Danny, Asay also told Moore that his plan was to have Bubba get McDowell in the truck and they "would take her off and screw her and kill her." Moore testified that Asay told him that when Bubba "didn't have [McDowell] in the truck so they could go beat him up," Asay "grabbed [McDowell] by the arm and stuck the gun in his chest and shot him four times, and that when he hit the ground, he finished him off." As a result of tips received from Moore and his cousin after McDowell's murder was featured on a television Crime Watch segment, Asay was arrested and charged by indictment with two counts of first-degree murder.
Asay v. State, 580 So.2d 610, 610-12 (Fla. 1991).
The jury found Asay guilty of the murders of both Booker and McDowell and recommended sentences of death for both murders. After concluding that the aggravating circumstances[1] surrounding the crime outweighed the mitigating circumstances,[2] the trial court imposed the death penalty for each of the murder convictions. We affirmed the convictions and sentences on direct appeal.[3]See id. at 614.
Asay filed his first motion for postconviction relief in the trial court on March 16, 1993.[4] On November 24, 1993, Asay *978 filed an amended motion alleging twenty claims.[5] In addition, on March 30, 1993, Asay filed a motion to disqualify the trial judge from presiding over the postconviction proceedings primarily on the basis of comments that the judge made during Asay's 1988 trial. The trial judge denied the motion to disqualify. After holding a Huff[6] hearing, the trial court summarily denied many of Asay's claims,[7] but the court held an evidentiary hearing regarding Asay's ineffectiveness of trial counsel claims. Following the evidentiary hearing, the trial court denied relief on these claims as well.

JUDICIAL BIAS
The first issue Asay raises on appeal is that judicial bias during the trial and postconviction proceedings resulted in a denial of "a fair and impartial tribunal throughout his proceedings in violation of his due process rights."[8] The same judge presided *979 over both Asay's trial and his postconviction proceedings.
Asay points to two statements the trial judge made during trial and one statement written in an order discharging counsel and granting attorney's fees. According to Asay, these statements show that the trial judge was actually biased during the original trial and that the trial judge should have granted Asay's motion to recuse the judge from presiding over the postconviction proceedings. As part of his ineffective assistance of counsel claim, Asay also asserts that his trial counsel was ineffective for failing to move to disqualify the trial judge on the basis of these statements.
The first comment relied upon by Asay occurred during voir dire, when the assistant state attorney asked a venireperson whether he could follow the law with regard to aggravating and mitigating circumstances. The venireperson answered, "I feel like if its premeditated, I just don't see any reason what [sic] could be mitigating circumstances when you premeditate it.... I'm very opposed to ... paying for somebody to sit in a jail and rot for years and years." At a bench conference concerning this venireperson, the trial judge stated, "I think what we ought to do is let him off the jury, but put him on the Supreme Court."
Asay also relies upon a second comment that was made during a bench conference that occurred prior to the State resting its case. During this discussion regarding what jury instructions are required by law, the trial judge stated, "The First District Court of Appeals won't hear the appeal in this case if there is a first-degree conviction of murder."
Third, Asay points to a comment in an order concerning discharge of Asay's court-appointed counsel and payment of attorney's fees. According to Asay,[9] the order stated that defense counsel had to endure the wrath of the victim's family and friends. Asay contends that the trial judge must have meant that defense counsel had to endure the wrath of the defendant's family and friends, and that the judge must have had improper ex parte contact with defense counsel in order to learn this.
As to Asay's claims of actual bias, these claims are procedurally barred because the grounds upon which the claims are based were known at the time of the direct appeal. See Rivera v. State, 717 So.2d 477, 481 n. 3 (Fla.1998); Stano v. State, 520 So.2d 278, 281 (Fla.1988); Zeigler v. State, 452 So.2d 537, 539 (Fla.1984). The statements relied upon by Asay contrast markedly with those in Porter v. State, 723 So.2d 191, 194 (Fla.1998), cert. denied, 526 U.S. 1120, 119 S.Ct. 1772, 143 L.Ed.2d 801 (1999), a case in which we vacated the death sentence due to evidence of the trial judge's actual bias during the penalty phase.[10] In Porter, the evidence of actual bias was unknown at the time of the original trial and direct appeal. See id. at 195. Further, the statements in Porter showed the judge actually lacked impartiality, thus violating the defendant's "constitutional right to a fair and impartial tribunal." Id. In this case, even if the claim of actual bias during trial was not procedurally barred, the comments attributed to the trial judge in the original trial are insufficient to show actual bias amounting to a denial of Asay's *980 constitutional right to a fair and impartial tribunal.[11]
In addition, we find that the trial judge also properly denied the motion to disqualify himself from presiding over the postconviction proceedings on the basis of these statements. As the State points out, Rule of Judicial Administration 2.160(e) requires that a motion to disqualify be filed "within a reasonable time not to exceed 10 days after discovery of the facts constituting the grounds for the motion." Similarly, section 38.02, Florida Statutes (1999), provides that motions to disqualify must be filed within thirty days after the party learns of the grounds for disqualification. Because the grounds upon which this motion to disqualify was based were known by the defense at the time of the original trial in 1988, the motion was untimely when filed in 1993.[12] In the past we have found motions to disqualify based on specific comments made at the original trial to be "forever waived" because they were not filed within thirty days of when the defendant learned of the statement. Rivera, 717 So.2d at 481 n. 3.
Of course, if the conduct or statements occur after the trial, then the postconviction proceeding may be the first time the defendant can raise them in a motion to recuse. See id. at 481 (addressing merits of motion to disqualify based on the judge's letter to the clemency board); Jackson v. State, 599 So.2d 103, 107 (Fla. 1992) (addressing a motion to disqualify from the defendant's fourth trial when the allegations of bias stemmed from three previous trials and two trials of codefendants); Jones v. State, 446 So.2d 1059, 1061 (Fla.1984) (addressing a motion to disqualify a judge from presiding over a postconviction proceeding on the merits where the defendant's claim was based on statements made by the trial judge following the sentencing proceedings). We acknowledge there might be circumstances where a motion to recuse based partially on comments made in a prior proceeding could be timely filed in a subsequent proceeding. For example, a motion to disqualify may be legally sufficient where a defendant learns of facts subsequent to the original trial, that when coupled with the trial judge's statements during the original trial or trials, gives rise to a "well-grounded fear on the part of the movant that he will not receive a fair hearing." Correll v. State, 698 So.2d 522, 524 (Fla.1997). However, this is not such a case.
In this case, the first two statements were made during the original trial. Not only are the statements untimely in this postconviction proceeding, but they would be legally insufficient when viewed in context. A motion to disqualify a judge "must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy." Rivera, 717 So.2d at 480-81 (quoting Jackson, 599 So.2d at *981 107). As to the statement in the order of discharge, no copy of this order appears in our record. Even assuming that the order was entered after the trial, a motion to disqualify must be "well-founded." Rivera, 717 So.2d at 481. Asay's allegations are sheer speculation and do not constitute legally sufficient grounds to support a motion for disqualification. See Willacy, 696 So.2d at 695 n. 5; McCrae v. State, 510 So.2d 874, 879-80 (Fla.1987). Accordingly, we find that this motion was correctly denied because it was untimely and legally insufficient.[13]
As for the incidents occurring during the postconviction proceeding that Asay points to as establishing an additional basis for recusal, these grounds were not raised by Asay in the trial court in a renewed motion for recusal, so they are not properly before this Court. See Gamble v. State, 659 So.2d 242, 245 (Fla.1995); Windom v. State, 656 So.2d 432, 439 (Fla.1995). Further, even if these grounds for recusal had been properly raised in the trial court, they would not have been legally sufficient. See Rivera, 717 So.2d at 481.
Accordingly, we conclude that the trial judge did not err in denying the postconviction claim concerning the judge's actual bias at trial and that trial counsel was not ineffective for failing to file a motion to disqualify. We likewise reject Asay's claim that the trial court erred in denying the motion to disqualify him from presiding over the postconviction proceedings.

LIMITATION OF TESTIMONY AT THE EVIDENTIARY HEARING
Asay claims that the trial court improperly limited the scope of the evidentiary hearing in three ways: (1) limiting the testimony of some of Asay's siblings concerning mitigating evidence not presented during the sentencing phase; (2) limiting the scope of Asay's examination of his trial counsel regarding his knowledge of prior inconsistent statements of key witnesses; and (3) refusing to hear the testimony of Thomas Gross recanting his trial testimony.
We first reject Asay's claims regarding the limitation of the testimony of his siblings and trial counsel. As the State asserts, "[t]his Court has long held that trial courts have `wide latitude' to regulate proceedings before them `in order that the administration of justice be speedily and fairly achieved in an orderly, dignified manner' and that `[i]n this function the trial judge exercises the sound discretion with which he is vested.'" Medina v. State, 573 So.2d 293, 295 (Fla.1990) (quoting Hahn v. State, 58 So.2d 188, 191 (Fla. 1952)); see Robinson v. State, 707 So.2d 688, 695 (Fla.1998); Garcia v. State, 622 So.2d 1325, 1327 (Fla.1993). The trial judge in this case allowed Asay to extensively question his siblings and his trial counsel concerning these issues and Asay has not demonstrated an abuse of discretion with regard to the limitation of this testimony.
Turning to the testimony of Thomas Gross, we find that the trial court did not abuse its discretion in excluding this testimony. During Asay's trial, Thomas Gross testified that while he and Asay were incarcerated together, Asay showed him his tattoos, which included a swastika, the words "White Pride," and the initials "SWP," which he testified stand for supreme white power. Asay, 580 So.2d at 612. In addition, Gross testified that Asay admitted to having "shot them niggers." Id.
Asay claims that Thomas Gross subsequently recanted his trial testimony. Although recanted testimony can constitute newly discovered evidence, Asay does not *982 claim that this recanted testimony constitutes newly discovered evidence. Thus, the trial judge was never required to evaluate the proffer under the newly discovered evidence standard.[14] Rather, Asay claims that Thomas Gross's testimony should have been considered in connection with a claim that the State violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), with regard to Gross's testimony.
We first agree with the State that the trial court did not err in failing to consider these additional claims. In Asay's original 3.850 motion, Asay included a claim that the prosecutor's inflammatory and improper comments and arguments injected the issue of race into the trial, rendering Asay's convictions and death sentences unreliable and unfair. One sentence of this broad claim in the original 3.850 motion stated that "in fact, the state called one witness whose only purpose was to portray Mr. Asay as a racist." After the limitations period for filing a postconviction motion expired, the trial court gave Asay leave to amend on the basis of new evidence received in public records requests.
In his amended 3.850 motion, Asay added one phrase to the sentence alleging that the State called one witness whose only purpose was to portray Asay as a racist. This new phrase provided that the State knew this witness's testimony to be "wholly false, misleading and in exchange for undisclosed benefit." Although Asay added a cite to Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and referred to the portion of the record where Gross testified, he did not even mention the identity of the witness who allegedly testified falsely. In an amended pleading of this nature where a Giglio or Brady claim is being asserted for the first time, we would at the very least expect counsel to state a separate claim with some specificity, as opposed to adding a phrase to a sentence of another unrelated claim.
Further, at the Huff hearing, Asay's collateral counsel stated that evidence existed to support this claim, without indicating which witness had testified falsely or what evidence now existed to show that the testimony was false. The trial court denied the claim as procedurally barred because it assumed that this claim related to Asay's assertion already raised and rejected on direct appeal that the State improperly injected race into the trial. Considering the conclusory nature of the allegations as to the Brady and Giglio claims, we find that the claims were legally insufficient and thus the trial court did not commit error in refusing to grant an evidentiary hearing as to these claims. See Ragsdale v. State, 720 So.2d 203, 207 (Fla.1998) (stating that although this Court encourages trial courts to conduct evidentiary hearings, a summary or conclusory claim "is insufficient to allow the trial court to examine the specific allegations against the record").
At the evidentiary hearing, Asay's collateral counsel asked the trial court to reconsider its ruling concerning this claim and for the first time proffered a summary of what the witness would testify to regarding the Brady and Giglio claim. Although Gross apparently was present and the State requested that the proffer be in the form of Gross's testimony so it could proffer its cross-examination, Asay's counsel refused to make Gross available to proffer his testimony and cross-examination. Despite the State's request, collateral *983 counsel also refused to submit an affidavit by Gross that counsel repeatedly asserted existed. In light of the vague allegations regarding this claim in the amended post-conviction motion and the failure of Asay's counsel to make his claim more explicit at the Huff hearing, Asay's failure to either produce Gross's affidavit or produce his actual testimony makes the proffer appear to be an evasive maneuver rather than a genuine attempt to ensure that the trial judge and this Court could adequately address the merits of this claim.[15] Nevertheless, we consider the proffer for the purposes of this appeal with the caveat that having Gross's actual sworn testimony to consider would have greatly assisted this Court in reviewing whether the trial judge committed reversible error. In light of the circumstances surrounding the presentation of this claim in the trial court, we find no abuse of discretion in the trial court failing to reconsider its ruling as to the Brady and Giglio claim.[16]
Even if we were to consider the merits of the Brady/Giglio claim, we find that as a matter of law it would fail "to put the whole case in such a different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555 n. 8, 131 L.Ed.2d 490 (1995)); see Giglio, 405 U.S. at 154, 92 S.Ct. 763. Taking Asay's allegations as true, Gross testified falsely that Asay had confessed to him and that Asay had shown him tattoos of a swastika, "white pride," and "SWP." Although Gross was the only witness to testify that Asay had racial tattoos, Asay makes no assertion that he does not in fact have the tattoos. This Court has rejected similar Brady/Giglio claims where the witness's credibility was attacked on other grounds during the trial. See Routly v. State, 590 So.2d 397, 399-401 (Fla.1991); see also Robinson v. State, 707 So.2d 688, 694 (Fla.1998). During trial, defense counsel impeached Gross on the basis of his deal with the prosecution to send letters on Gross's behalf to other jurisdictions where charges were pending and questioned whether he was getting additional benefits. Defense counsel also impeached Gross with the fact that he had previously been charged with perjury and that he initially refused to give a deposition. Defense counsel re-emphasized these points during closing argument.
This evidence was also largely cumulative of other evidence introduced at trial. In addition to the jailhouse confession testified to by Gross, the jury also heard the eyewitness testimony of Robbie Asay and Bubba O'Quinn, as well as testimony that Asay had confessed to Danny and Charlie Moore. Robbie Asay and O'Quinn also testified to statements made close to the time of the crime indicating that Asay was motivated by racial animus. Gross was the only witness to testify that Asay had racial tattoos. However, Robbie testified that prior to shooting Booker, Asay said "F__k you nigger," and Asay later explained *984 that he had shot Booker "because you got to show a nigger who is boss."
In light of Asay's statements to his brother Robbie Asay, Bubba O'Quinn, and Danny and Charlie Moore, all of which indicated racial motivation in committing these murders, and the fact that defense counsel thoroughly impeached Gross on the issue of his plea bargain with the State and his motive to fabricate, we cannot conclude that this evidence undermines confidence in the reliability of the trial. See Strickler, 119 S.Ct. at 1952; Giglio, 405 U.S. at 154, 92 S.Ct. 763.

INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS
In Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court explained that the constitution requires that criminal defendants be afforded effective counsel in order "to ensure a fair trial." Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. In order to evaluate ineffectiveness claims, the Supreme Court set forth a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687, 104 S.Ct. 2052 (emphasis supplied); see, e.g., Rutherford v. State, 727 So.2d 216, 219 (Fla.1998).
There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. In addition, the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy. See Jones v. State, 732 So.2d 313, 319 (Fla. 1999).
Both the performance and prejudice components of an ineffectiveness claim are mixed questions of law and fact. See Strickland, 466 U.S. at 698, 104 S.Ct. 2052; Rutherford, 727 So.2d at 220. Following the evidentiary hearing in this case, the trial judge entered a well-reasoned and thoughtful order finding that Asay's trial counsel in both the guilt and penalty phases of the trial met the requirements of the Sixth Amendment.

A. Ineffective Assistance During the Guilt Phase

In his guilt-phase ineffective assistance of counsel claim, Asay first argues that counsel failed to zealously pursue a reasonable doubt strategy, especially by failing to adequately impeach the State's key witnesses. However, the trial court found that the inconsistencies in the witnesses' previous versions of events were relatively insignificant and the reliability of the trial would not have been increased had the witnesses been further impeached. See Van Poyck v. State, 694 So.2d 686, 697 (Fla.1997). As for Asay's second argument, counsel is not ineffective for failing to present a voluntary intoxication defense where no evidence of intoxication was presented. See Kokal v. Dugger, 718 So.2d 138, 141 n. 12 (Fla.1998); Rivera v. State, 717 So.2d 477, 485 (Fla.1998). Third, Asay claimed that counsel was ineffective for failing to rebut the State's arguments that he committed the crime due to his racial *985 animus. The trial court found that the additional witnesses Asay asserts should have been presented at trial would have been subject to damaging impeachment. See Haliburton v. Singletary, 691 So.2d 466, 470 (Fla.1997); Garcia, 622 So.2d at 1327. We find that even if counsel's performance was deficient for failing to discover these additional witnesses, no prejudice ensued.
After giving deference to the factual findings of the trial court and independently reviewing the court's legal conclusions, see Stephens v. State, 748 So.2d 1028, 1033-34 (Fla.1999), we affirm the trial court's denial of Asay's claim that his guilt phase counsel deprived him of the constitutional right to effective assistance of counsel.

B. Ineffective Assistance of Penalty Phase Counsel

Asay next asserts that his penalty phase counsel was ineffective for failing to investigate and present statutory mitigating evidence that he was acting under extreme emotional distress and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. In addition, Asay asserts that his counsel was ineffective for failing to present nonstatutory mitigating evidence of physical and emotional abuse and poverty during his childhood, alcohol abuse and his history of "huffing" inhalants.
In determining whether the penalty phase proceedings were reliable, "[t]he failure [of counsel] to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rose v. State, 675 So.2d 567, 571 (Fla.1996). When evaluating claims that counsel was ineffective for failing to present mitigating evidence, this Court has phrased the defendant's burden as showing that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding." Rutherford, 727 So.2d at 223. With these standards in mind, we affirm the trial court's order denying Asay's claims that his penalty phase counsel was ineffective.

1. Failure to Investigate and Present Mental Health Mitigation

Asay's original penalty phase counsel had him examined by a psychiatrist, Dr. Vallely. In his report, Dr. Vallely diagnosed Asay with antisocial personality disorder but found that Asay did not exhibit an "emotional or cognitive disturbance." Dr. Vallely also stated that Asay was manipulative and deceptive. Asay claims that his penalty phase counsel rendered ineffective assistance by failing to present readily available mental health mitigation. In addition, Asay alleges that his trial counsel failed to provide Dr. Vallely with adequate background materials, thus depriving him of an adequate mental health evaluation. In support of his claim, Asay presented the testimony of a psychologist and a psychiatrist.
This Court has found counsel's performance was deficient where counsel "never attempted to meaningfully investigate mitigation" although substantial mitigation could have been presented. Rose, 675 So.2d at 572; Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995) ("woefully inadequate" investigation failed to reveal a large amount of mitigating evidence, such as prior psychiatric hospitalizations and statutory mental health mitigators); State v. Lara, 581 So.2d 1288, 1289 (Fla.1991) (finding counsel "virtually ignored" preparation for penalty phase).
However, in those cases where counsel did conduct a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information, we have affirmed the trial court's findings that counsel's performance was not deficient. See Rutherford, 727 So.2d at 223; Jones, 732 So.2d at 317; Rose v. State, 617 So.2d 291, 293-94 (Fla. 1993). This case is similar to Jones, where the defendant had been examined prior to trial by a mental health expert who gave an unfavorable diagnosis. As we concluded *986 in Jones, the first evaluation is not rendered less than competent "simply because appellant has been able to provide testimony to conflict" with the first evaluation. 732 So.2d at 320; see Rose, 617 So.2d at 295. Also instructive is our opinion in Rose, where a psychologist advised trial counsel prior to the penalty phase that the defendant suffered from antisocial personality disorder and ruled out the possibility of an organic brain disorder. 617 So.2d at 294. In both Rose and Jones, we affirmed the trial court's finding that counsel had made a reasonable tactical decision not to further pursue an investigation of mental health mitigation evidence after receiving an initial unfavorable diagnosis. See Jones, 732 So.2d at 320 n. 5; Rose, 617 So.2d at 294.
The trial court in this case made a factual finding that penalty phase counsel reasonably relied upon Dr. Vallely's report, which concluded that the defendant suffered from antisocial personality disorder and did not exhibit an "emotional or cognitive disturbance." Further, the notes attached to the report indicate that Dr. Vallely was aware of most of the facts now advanced by collateral counsel, such as that Asay "huffed" solvents in prison, that he had been attacked by African-American inmates in prison, and that his stepfather was physically abusive. Dr. Sultan, a clinical psychologist who testified for Asay at the evidentiary hearing, testified that the results of the psychological tests she administered were not inconsistent with the results garnered by Dr. Vallely and a competent psychologist could have reached Dr. Vallely's diagnosis. As in both Rose and Jones, the trial court correctly found that trial counsel conducted a reasonable investigation into mental health mitigation evidence, which is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert. See Jones, 732 So.2d at 320; Rose, 617 So.2d at 294. Accordingly, we affirm the trial court's ruling that Asay has failed to establish that his trial counsel's performance was deficient because of his failure to introduce favorable mental health mitigating evidence.
Moreover, Asay has not established that any deficiency in counsel's performance "depriv[ed] the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. In assessing prejudice, "it is important to focus on the nature of the mental health mitigation" now presented. Rutherford, 727 So.2d at 223. At the evidentiary hearing, Asay presented the testimony of Dr. Sultan, a psychiatrist, and Dr. Crown, a psychologist. Dr. Crown testified that Asay suffers from a neurological impairment that diminishes his ability to solve problems, engage in critical thinking, concentrate, shift from one idea to another, and understand the long-term consequences of his behavior. As a result, Dr. Crown concluded that Asay met the statutory mitigating circumstances of acting under extreme emotional disturbance and being unable to conform his conduct to the requirements of law.
Dr. Sultan also testified that Asay suffered from long-standing mental health impairments, resulting in problems with impulse control, abstract problem solving, attentional problems and memory problems. Like Dr. Crown, Dr. Sultan found that both statutory mental health mitigating circumstances were applicable to Asay. In addition, she testified that nonstatutory mitigation was present, including that Asay had been a victim of severe emotional, physical and sexual abuse during his childhood; he had an extensive history of alcoholism; and he had organic brain damage.
The trial court found that the testimony of Drs. Crown and Sultan would not have been entitled to significant weight had it been presented in the penalty phase because neither expert was familiar with the significant facts of this crime and their diagnoses were speculative at best. We agree. See Rutherford, 727 So.2d at 224 (finding no error in trial court's assessment that "there is no evidence [the defendant's] *987 disorder contributed to his actions in effecting the murder"); Rose, 617 So.2d at 293-94. In Rose, we found that the trial court did not abuse its discretion in rejecting the expert evidence of mental health mitigation presented at the evidentiary hearing as "farfetched and unworthy of belief." 617 So.2d at 293.
Further, the nature of the evidence now presented does not undermine the reliability of the trial. Although Dr. Crown testified that Asay has organic brain damage, he also testified that this results in a deficiency in problem solving. Dr. Sultan acknowledged that Asay had the capacity to formulate a plan and neither expert was surprised that Asay wrote extensive notes for his counsel during trial concerning the cross-examination of witnesses. The mitigation presented at the evidentiary hearing is of a qualitatively lesser caliber than in other cases where this Court found that counsel rendered ineffective assistance for failing to present mental health mitigation. Compare Rose, 675 So.2d at 571 (defendant had previously been characterized as schizoid and suffered from organic brain damage and a longstanding personality disorder); Heiney v. State, 620 So.2d 171, 173 (Fla.1993) (defendant diagnosed with borderline personality disorder); Phillips v. State, 608 So.2d 778, 783 (Fla.1992) (defendant had a schizoid personality and was passive-aggressive); Lara, 581 So.2d at 1289 (the defendant's bizarre behavior signaled serious mental disorientation).
In aggravation, the trial court found applicable to both murders the aggravating circumstances that Asay was on parole at the time of the murders and that he had committed a contemporaneous murder. As for the McDowell murder, the trial court found and this Court upheld the additional aggravating circumstance that the murder had been cold, calculated and premeditated. In light of these aggravating circumstances, after giving deference to the factual findings of the trial court and independently reviewing the court's legal conclusions, see Stephens, 748 So.2d at 1033-34, we affirm the trial court's finding that the existence of this additional mental health mitigation does not undermine the reliability of the penalty phase proceeding.

2. Failure to Investigate and Present Other Mitigation

Asay also argues that his counsel rendered deficient performance for failing to investigate and present nonstatutory mitigation of his abusive and poverty-stricken childhood and his history of alcohol abuse and "huffing" solvents. At trial, counsel presented nonstatutory mitigation through Asay's mother that Asay was affectionate towards her, provided her with financial help in the past, remodeled her house, gave gifts of clothing to other inmates while incarcerated, and acquired his GED while in prison. In addition, during closing arguments, defense counsel emphasized Asay's relative youth at the time of the offense. At the evidentiary hearing, collateral counsel presented evidence of a childhood where Asay suffered severe beatings at the hands of his parents, was deprived of food, and at the age of twelve provided sexual favors to men in exchange for money.
Asay argues that the trial court's finding that his penalty phase counsel conducted a reasonable investigation is without support, and that penalty phase counsel could not have made a strategic decision not to use this testimony because he did not know the extent of available nonstatutory mitigation. During the evidentiary hearing, penalty phase counsel testified that he interviewed Asay and his mother concerning the existence of mitigating circumstances and his investigator contacted additional potential witnesses regarding mitigation. Trial counsel testified that he was not aware of the extent of the abuse alleged in the 3.850 motion. However, counsel also testified that he knew that there was "some evidence" that Asay's "childhood had not been a great one" and that there had been problems with Asay's mother leaving *988 her children alone for lengths of time. We thus find the trial court's factual finding that Asay's counsel conducted a reasonable investigation is supported by competent substantial evidence, especially when coupled with penalty phase counsel's testimony as to the difficulty in obtaining information from Asay's mother. See Rutherford, 727 So.2d at 225.
Even had Asay's counsel performed deficiently in failing to conduct an adequate investigation, we agree with the trial judge's conclusion that Asay has failed to establish prejudice as required by Strickland because the penalty proceedings were not rendered unreliable by this deficiency. The trial court concluded that the defendant failed to establish prejudice because there is no possibility that this evidence would have outweighed the aggravating circumstances. Unlike the mitigating evidence presented in Phillips, this evidence would have opened the door to damaging cross-examination regarding Asay's violent past. We have previously recognized that a defendant is not prejudiced by the failure to introduce this type of nonstatutory mitigation when it would have opened the door to testimony of the defendant's violent past. See Breedlove v. State, 692 So.2d 874, 877-78 (Fla.1997); Medina, 573 So.2d at 298; see also Elledge v. Dugger, 823 F.2d 1439, 1445-48 (11th Cir.), vacated in part on other grounds, 833 F.2d 250 (11th Cir.1987). In this case, two of Asay's siblings testified on cross-examination that he had previously threatened to kill his brother's father-in-law. The siblings also believed that Asay had stabbed his brother's dog.
Finally, when examining whether the defendant was prejudiced by the failure of counsel to present this nonstatutory mitigation, the Court must consider the nature of the aggravating and mitigating evidence presented in the penalty phase. As discussed above, the trial court found applicable the statutory aggravating circumstances that the murder was committed while the defendant was on parole and the defendant had a prior violent felony conviction for the contemporaneous murder. In the McDowell murder, the trial court additionally found the CCP aggravator to be applicable.
The evidence now asserted by Asay is potential nonstatutory mitigation. See Rutherford, 727 So.2d at 226. The question is whether in light of this additional mitigation evidence it is "reasonably probable, given the nature of the mitigation offered, that this altered picture would have led to the imposition of a life sentence, outweighing the multiple substantial aggravators at issue in this case." Id. In Breedlove, this Court concluded that the aggravating circumstances of prior violent felony, murder committed during the course of a burglary, and HAC overwhelmed the mitigation testimony presented concerning childhood beatings and alcohol abuse. 692 So.2d at 878. Likewise, this Court has reasoned that where the trial court found substantial and compelling aggravation, such as commission while under sentence of imprisonment, prior violent felonies, commission during a burglary, and CCP, there was no reasonable probability that the outcome would have been different had counsel presented additional mitigation evidence of the defendant's abused childhood, history of substance abuse, and brain damage. See Haliburton, 691 So.2d at 471. After giving deference to the factual findings of the trial judge and independently reviewing the trial judge's legal conclusions, see Stephens, 748 So.2d at 1033-34, we affirm the trial court's finding that in light of the aggravating circumstances, there is no reasonable probability that mitigation evidence of the defendant's abusive childhood and history of substance abuse would have led to the imposition of a life sentence. Accordingly, we affirm the denial of Asay's claim that his counsel was ineffective for failing to present this evidence during the penalty phase.

*989 SUMMARY DENIAL OF OTHER CLAIMS
In his last point on appeal, Asay raises a number of claims which he asserts the trial court improperly summarily denied. Asay argues that the trial court's order denying an evidentiary hearing on these claims is insufficient because it does not contain attachments of the record, relying on Hoffman v. State, 571 So.2d 449, 450 (Fla.1990). However, this Court's cases decided since Hoffman have made clear that an order denying an evidentiary hearing is sufficient if it sets forth a clear rationale explaining why the motion and record conclusively refute each claim. See Diaz v. Dugger, 719 So.2d 865, 867 (Fla. 1998). The trial court's order in this case sets forth a clear rationale explaining why each claim was summarily denied, satisfying the requirements of Diaz.
We first affirm the trial court's summary denial of claims XIV and XV, both of which concern the trial court's refusal to grant a continuance prior to the penalty phase to secure the attendance of mitigating witnesses and the alleged resulting constitutional violations, and claim XVIII, which alleges that the jurors' sense of sentencing responsibility was unconstitutionally diminished. These claims were raised and rejected on direct appeal, see Asay, 580 So.2d at 612 n. 1, and are thus procedurally barred in this proceeding. See, e.g., Medina, 573 So.2d at 295. As we stated in Medina, "it is inappropriate to use a different argument to relitigate the same issue." Id. Accordingly, "even if couched in ineffective assistance language," Johnson v. Singletary, 695 So.2d 263, 265 (Fla.1996), these claims that were raised on direct appeal are procedurally barred. See Robinson, 707 So.2d at 699; Valle v. State, 705 So.2d 1331, 1336 n. 6 (Fla.1997).
In addition, a number of Asay's postconviction claims are procedurally barred because although they were not raised on direct appeal, they could have been. We thus affirm the denial of claims V and VI regarding alleged deficiencies in the jury instructions for the cold, calculated and premeditated aggravating circumstance and the denial of claim VII challenging section 921.141, Florida Statutes (1987). See Valle, 705 So.2d at 1335; Henderson v. Singletary, 617 So.2d 313, 315 (Fla.1993). We also affirm the denial of claim VII, asserting that the State's penalty phase argument regarding the aggravating circumstances was vague and overbroad. See Cherry v. State, 659 So.2d 1069, 1072 (Fla. 1995). Likewise, Asay could have raised on direct appeal his argument in claim IX that the trial court erred in failing to find mitigating evidence in the record on direct appeal, see Diaz, 719 So.2d at 868 n. 6, his argument in claim X that the penalty phase jury instructions impermissibly shifted the burden of proof, see Valle, 705 So.2d at 1336 & n. 6, and his argument in claim XVII that the prosecutor improperly told the jury that they could not consider mitigating evidence, see Van Poyck, 694 So.2d at 699 n. 8. Although many of these claims include one sentence making a conclusory allegation that counsel was ineffective with regard to these claims, this "is an attempt to relitigate procedurally barred claims by couching them in terms of ineffective assistance of counsel." Valle, 705 So.2d at 1336 n. 6; see Cherry, 659 So.2d at 1072.
In addition, the trial court properly summarily denied claims XIX and XII for failure to comply with the requirement in rule 3.850(c)(6) that defendants allege "a brief statement of facts (and other conditions) relied on in support of the motion." Finally, we affirm the trial court's denial of claim XX regarding cumulative error because we have considered the individual alleged errors and find them to be without merit. See Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999).

CONCLUSION
For the reasons expressed in this opinion, we affirm the trial court's denial of postconviction relief.
It is so ordered.
*990 HARDING, C.J., and SHAW, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS and ANSTEAD, JJ., concur in result only.
NOTES
[1] The trial court found that: (1) the murder was committed by a person under sentence of imprisonment because Asay was on parole; and (2) Asay had been previously convicted of a capital felony based on the contemporaneous murder conviction. A third aggravating circumstance was found applicable to the McDowell murderthat the murder was committed in a cold, calculated manner without any pretense of any moral or legal justification (CCP).
[2] In mitigation, the trial court considered Asay's age of twenty-three at the time of the murders but did not weigh this factor "very heavily as the Defendant has had extensive prior contact with the criminal justice system."
[3] On direct appeal, Asay raised seven claims: (1) the trial judge erred in failing to grant Asay's motion for judgment of acquittal for the murder of Booker because the State failed to establish premeditation; (2) the trial court erred in finding that the McDowell murder was CCP; (3) the death sentences were disproportionate; (4) the trial court erred by allowing racial prejudice to be injected into the trial; (5) the trial court erred in failing to advise Asay of his right to represent himself and to conduct an inquiry when Asay asked to discharge court-appointed counsel; (6) the trial court erred in denying Asay's motion for a continuance prior to the penalty phase to enable him to secure additional mitigation witnesses; and (7) the prosecution improperly diminished the jury's role in sentencing. See Asay v. State, 580 So.2d 610, 613-14 & n. 1 (Fla.1991).
[4] While his postconviction motion was pending, Asay, along with other capital defendants, brought an appeal of the denial of his public records requests by the Florida Board of Executive Clemency. See Asay v. Florida Parole Comm'n, 649 So.2d 859 (Fla.1994). This Court held that the obligation of the State to disclose exculpatory material under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), does not apply to clemency records. See Asay, 649 So.2d at 860.
[5] Asay's claims were: (I) state agencies withheld public records; (II) the judge presiding over the trial was biased and trial counsel was ineffective for failing to recuse him; (III) the original trial judge should have recused himself from presiding over the postconviction proceedings because he is biased; (IV) trial counsel was ineffective during the guilt phase; (V) the jury instructions for the CCP aggravator failed to limit the jury's consideration and it was not supported by the evidence; (VI) the CCP jury instruction was unconstitutional and counsel was ineffective for failing to object; (VII) Florida's sentencing scheme is unconstitutional; (VIII) aggravating circumstances were overbroadly argued by the State; (IX) the trial judge erred in failing to find mitigation present in the record; (X) the penalty phase jury instructions shifted the burden of proof to the defendant; (XI) the prosecutor's inflammatory comments rendered Asay's trial fundamentally unfair; (XII) Asay was denied his right to an adequate mental health evaluation under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (XIII) ineffective assistance in the penalty phase; (XIV) the denial of Asay's motion for a continuance before the penalty phase to secure additional mitigation witnesses denied him due process and rendered counsel ineffective; (XV) the trial court prevented Asay from presenting mitigation evidence in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); (XVI) Asay's guilt phase counsel was ineffective for failing to present a voluntary intoxication defense; (XVII) the prosecutor improperly stated that sympathy could not be considered by the jury; (XVIII) the jury instructions unconstitutionally diluted the jury's sense of sentencing responsibility and counsel was ineffective for failing to ensure that the jury received adequate instructions; (XIX) prosecutorial misconduct rendered Asay's conviction unreliable; and (XX) Asay's trial court proceedings were fraught with errors that cannot be considered harmless when considered as a whole.
[6] Huff v. State, 495 So.2d 145 (Fla.1986).
[7] The parties stipulated that Asay's public records claim (I) was moot. The trial court had already denied Asay's motion for recusal and accordingly denied claim (III) in which Asay alleged that the judge was biased and should not preside over the postconviction proceedings. The trial court denied the following claims as procedurally barred because they had already been raised on direct appeal and conclusory ineffectiveness claims could not be used to obtain a second appeal: (XI) the prosecutor's inflammatory racial comments; (XIV) the trial court's denial of Asay's motion for a continuance to secure additional mitigation witnesses; (XV) the trial court prevented Asay from presenting mitigation evidence; (XVIII) the jury instructions unconstitutionally diluted the jury's sense of sentencing responsibility. The trial court denied the following claims as procedurally barred because they should have been raised on direct appeal: (II) judicial bias during trial; (V) the CCP jury instructions were improper; (VI) the CCP jury instructions were unconstitutional; (VII) constitutionality of the sentencing scheme; (VIII) overbroad argument concerning aggravators; (IX) trial court's failure to find mitigation in the record; and (XVII) the prosecutor improperly stated that sympathy could not be considered by the jury. The Court found that claim (X) alleged ineffectiveness of appellate counsel, which should be raised in a petition for habeas corpus. The court denied the following claims as insufficient because they did not allege sufficient facts upon which to base relief: (XII) the defendant had been denied his right to a mental health evaluation; (XIX) prosecutorial misconduct; (XX) cumulative error.
[8] This appellate claim corresponds with his second and third claims in his motion for postconviction relief.
[9] The order does not appear in our record and the motion to disqualify does not indicate when the order was entered.
[10] Following the trial in Porter v. State, 723 So.2d 191 (Fla.1998), the clerk of court filed an affidavit attesting that the presiding judge had stated that the county "had good, fair minded people here who would listen and consider the evidence and then convict the son-of-a-bitch" and that the judge "would send Porter to the chair." Id. at 194. The trial judge also testified at the evidentiary hearing that "I believe that if the same thing had happened, that I would have killed Mr. Porter. Mr. Porter wouldn't have had to be put to death. But if he had done that to my family, I'd a killed him." Id. at 196 n. 1.
[11] Nevertheless, we caution trial judges in these solemn proceedings to be cautious in making remarks that appear injudicious when read later in a cold record.
[12] In Willacy v. State, 696 So.2d 693, 695 (Fla.1997), we found a similar motion to disqualify to be untimely. We stated that the motion to disqualify was untimely because it was filed more than ten days after the original trial judge had been appointed to preside over the resentencing proceedings, but also stated that it was untimely because "[t]he grounds for the motion were in existence since the first trial and Willacy was represented by counsel throughout this period." Id. Accordingly, our decision in Willacy does not decisively answer the question of from what date the timeliness of a motion to disqualify is calculated.

Likewise, we reject Asay's reliance on Quince v. State, 732 So.2d 1059, 1062 n. 5 (Fla.1999), in support of the argument that because the trial judge considered this motion on the merits, the State's argument that the motion was untimely became moot. In this case, the trial judge simply denied the motion to disqualify without any explanation. Our statement in footnote five of Quince was dicta and should not be read to support the proposition that if a trial judge makes alternative rulings that a claim is meritless and procedurally barred, the disposition on the merits renders moot the alternative ruling that the issue is procedurally barred.
[13] Because we have found the grounds raised to have been legally insufficient to warrant disqualification, we further affirm the trial court's summary denial of Asay's claim that counsel was ineffective for failing to move to disqualify the trial judge on this basis at the time of the original trial.
[14] See generally Jones v. State, 709 So.2d 512, 521 (Fla.1998) (providing that newly discovered evidence must have been both "unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence" and the evidence is "of such nature that it would probably produce an acquittal on retrial").
[15] We recognize, however, that a summary of testimony by counsel can be considered a sufficient proffer if it adequately informs the appellate court of the scope and substance of the proposed testimony. See Charles W. Ehrhardt, Florida Evidence § 104.3 (1998 ed.).
[16] Asay makes an alternative claim that the trial court should have considered this testimony in support of his allegations that counsel was ineffective for failing to discover and impeach Gross with this evidence. However, we find no error in the trial court's ruling because Asay never pled an ineffective assistance claim on this basis. As for Asay's claim that the trial court erred in quashing a subpoena duces tecum with regard to this claim, we find that Asay has not demonstrated an abuse of discretion. See State v. Lewis, 656 So.2d 1248, 1250 (Fla.1994). Concerning Asay's additional public records requests filed following the evidentiary hearing in this case, we find that Asay has waived this issue because "any postconviction movant dissatisfied with the response to any requested access must pursue the issue before the trial judge or that issue will be waived." Gaskin v. State, 737 So.2d 509, 518 (Fla.1999) (quoting Lopez v. Singletary, 634 So.2d 1054, 1058 (Fla. 1993)).