987 So.2d 1 (2008)
Ronald Lee WILLIAMS, Appellant,
v.
STATE of Florida, Appellee.
Ronald Lee Williams, Petitioner,
v.
James R. McDonough, etc., et al., Respondents.
Nos. SC05-226, SC05-1579.
Supreme Court of Florida.
January 10, 2008.
Rehearing Denied July 11, 2008.
*4 Joseph F. McDermott of McDermott Law Firm, P.A., St. Petersburg Beach, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Meredith Charbula and Carolyn M. Snurkowski, Assistant Attorneys General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Ronald Lee Williams appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death, filed under Florida Rule of Criminal Procedure 3.851, and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons set out below, we affirm the trial court's denial of postconviction relief as it pertains to the guilt-phase portion of appellant's trial. However, we reverse the trial court's denial of relief on appellant's claim that trial counsel was ineffective in failing to present the trial court with available evidence of mitigation. We deny the petition for writ of habeas corpus.

FACTS
Williams' convictions for murder and sentence of death arose out of his involvement in an illegal drug business. We described the circumstances in our earlier review of his case:
The evidence establishes that Williams ran a drug trafficking ring from Miami that extended from Miami to Pensacola. In September of 1988, Bruce Frazier, who oversaw Williams' Pensacola operation, became concerned that his ex-girlfriend would alert the police to the drug ring. Bruce Frazier and Michael McCormick, a street-level employee, moved a safe containing cocaine and money from one of the apartments used in the drug business to Michael McCormick's apartment. During a telephone conversation, Williams told Bruce Frazier to go to McCormick's apartment to obtain other money that McCormick owed Williams. Upon reaching the apartment, McCormick informed Bruce Frazier that the money he owed Williams and the safe they had just moved from Bruce Frazier's apartment had been stolen. Bruce Frazier called Williams and informed him of the situation and the fact that there were no visible signs of a forced entry into McCormick's apartment. Bruce Frazier testified that Williams allegedly stated that he was sending some people up to Pensacola to get the money and drugs back.
On September 19, 1988, Williams sent Timothy Robinson, Bruce Frazier's brother Darrell Frazier, and Michael Coleman from Miami to Pensacola to begin a search for the missing cocaine and money. These individuals met McCormick and Bruce Frazier at a hotel in Pensacola and went to McCormick's apartment. After obtaining several weapons from McCormick, they went to the apartment next door and forced *5 their way in. In the apartment were Darlene Crenshaw, Amanda Merrill, Derek Hill, and Morris Alfonso Douglas. Mildred Baker, McCormick's girlfriend, was brought in shortly thereafter. Hill, Merrill, Baker, and Douglas were ordered to take their clothes off. They were then bound and gagged, and made to lie on the floor. The four men then began interrogating the prisoners. After his demands regarding the whereabouts of the money and cocaine went unanswered, Robinson began stabbing Hill. Meanwhile, the other accomplices physically assaulted some of the other hostages with kitchen knives found in the apartment.
At this point, Darlene Crenshaw stated that she knew where the stolen contraband was and that McCormick was involved in the theft. After Crenshaw's revelation, McCormick was also stripped, tied up, and stabbed several times. The Fraziers took Crenshaw to her apartment where they retrieved the cocaine and cash. The Fraziers left Crenshaw at her apartment and returned to Hill's apartment.
Meanwhile, at Hill's apartment, Mildred Baker and Amanda Merrill were repeatedly raped by Robinson and Coleman. The men were apparently stabbed and slashed several more times. Once the Frazier brothers returned, Coleman and Robinson systematically began killing the prisoners. All of the prisoners except Merrill died at the scene. Coleman first slashed Merrill's throat several times. Someone then shot Merrill in the back of the head. After the men left, Merrill was miraculously able to free herself and call 911.
Williams v. State, 622 So.2d 456, 458 (Fla. 1993). At the trial, Darrell Frazier testified as to his involvement and asserted that Williams had ordered him and the others to "drop" whoever was involved with the theft of his money and drugs. Id. at 459. Bruce Frazier testified about the drug operation he established for Williams in Pensacola, admitted to his involvement in the crimes, and asserted that when they got back to Miami, Williams had stated that he could "get the most time" for the crime because he ordered the people to be killed. Id. Bruce also testified as to two drive-by shootings that occurred in Jacksonville months before the incident in Pensacola in which Williams and others had unsuccessfully attempted to kill an associate of Williams who had decided to set up his own drug operation. Id. at 460. The jury found Williams guilty as charged for his role in the four killings. Id.
Prior to the conduct of Williams' trial, three of his codefendants were tried and convicted of the murders. Id. Each of the three also received separate jury recommendations that a life sentence rather than death be imposed as punishment. See Coleman v. State, 610 So.2d 1283, 1285 & n. 3 (Fla.1992). In each of the three cases, however, the trial judge, the same judge that presided over Williams' case, overrode each jury's recommendation and imposed a death sentence. See id. Williams' trial counsel was aware of the trial judge's overrides in those cases. Prior to the penalty phase, defense counsel was also presented with a detailed report from a mental health expert that contained extensive evidence of mitigation including evidence of an abusive childhood, substance abuse, and mental impairment. Nevertheless, during the penalty phase, defense counsel did not present this evidence to the jury or the judge and, instead, presented only minimal mitigation evidence that Williams helped his loved ones as much as he could. See Williams, 622 So.2d at 460. The State relied on the evidence presented at the guilt phase. Id. After the penalty phase was completed, the jury recommended *6 a life sentence by a vote of eleven to one. Id. However, as in the other cases, the trial judge overrode this recommendation. Id. at 461.
In his sentencing order, the trial judge found six aggravating circumstances: (1) Williams was previously convicted of another capital felony  the murder of the other three victims; (2) the murders were committed while Williams was an accomplice in a robbery, sexual battery, burglary, and kidnapping; (3) the murders were committed for the purpose of avoiding arrest; (4) the murders were committed for pecuniary gain; (5) the murders were heinous, atrocious, or cruel (HAC); and (6) the murders were committed in a cold, calculated, and premeditated (CCP) manner without any pretense of legal or moral justification. Id. at 460.
The trial judge found that no statutory mitigating factors were present and that only one nonstatutory mitigating factor was established: that Williams was a loving family member to his son and mother. Id. In overriding the jury's recommendation of life, the trial judge stated: "The jury's recommendation of [a] life sentence could have been based only on minor, nonstatutory mitigating circumstances or sympathy and was wholly without reason." Id. at 461. On appeal, this Court struck two of the aggravating factors found by the trial court, that the murders were heinous, atrocious, and cruel, and that they were committed to avoid arrest, but nevertheless affirmed the sentence of death because of the existence of only "miniscule" evidence of mitigation. Id. at 463-65.
Williams subsequently filed a motion for postconviction relief asserting numerous claims, including claims that defense counsel rendered ineffective assistance at both the guilt and penalty phases. Postconviction proceedings were conducted before the same trial judge who sentenced Williams to death. An evidentiary hearing was held, and afterwards, the trial judge denied all of Williams' claims. Williams now seeks review, raising ten issues on appeal. He has also filed a petition for a writ of habeas corpus, raising a Ring[1] claim.

ANALYSIS
We first consider the postconviction issues raised by Williams relating to the guilt phase of appellant's trial.

Independent Act Instruction
In his first postconviction claim, Williams asserts that his counsel was ineffective during the guilt phase because he failed to request a special jury instruction relative to the independent act defense. At the postconviction evidentiary hearing, defense counsel conceded that an independent act instruction may have been appropriate but offered no explanation of why he did not seek such an instruction other than his confidence that Williams would not be found guilty because he did not actually participate in the murders.
Claims of ineffective assistance of counsel must be analyzed under the standard espoused in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to be entitled to relief, Williams must meet two requirements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that *7 counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
In Lovette v. State, 636 So.2d 1304 (Fla. 1994), this Court addressed a similar claim. Specifically, in that case, Lovette and his codefendant, Wyatt, escaped from prison and fled. Id. at 1305. While on the run, they robbed a Domino's store, holding an employee, the store manager, and his wife at gunpoint. Id. Lovette thought his codefendant was going to lock the robbery victims in a closet, but instead, he heard gunshots. Id. at 1306. The two then fled the store in a stolen car. Id. At trial, Lovette requested an instruction on independent acts, alleging that he should not be held responsible for the murders since they were outside the common design of the robbery. Id. The trial court denied the request, and this Court affirmed, stressing that "[o]ne who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime." Id. (quoting Jacobs v. State, 396 So.2d 713, 716 (Fla.1981)). Thus, even though Lovette did not fire the shots that killed the victims or agree to the murders, we concluded the evidence did not support an independent act instruction as to the murders because the evidence demonstrated Lovette was a willing participant in the robbery and the killings furthered the robbery in that they assisted the robbery's execution and lessened the immediate detection of the robbery. Id. at 1307.
Williams' sole basis to support his assertion that the independent act theory should apply to his case is based on the fact that he was not in Pensacola at the time of the killings but simply sent the codefendants to Pensacola to bring back his drugs and money; thus, the killings were the independent acts of the codefendants. However, as a perpetrator in the underlying felony, as in Lovette, Williams is deemed a principal in any crime committed to further the initial common criminal design. Here, it is apparent that the murders furthered the commission of the underlying felonies, by helping the codefendants locate the missing money and drugs and helping the codefendants elude detection after they recovered the drugs and money. Williams has failed to show how his counsel could be ineffective in failing to request a jury instruction which did not apply to the facts of this case. In addition, it is apparent that Williams was charged with the murders because of his role in ordering the killings, and the jury rejected his denial of such a role. Hence, the jury implicitly rejected any claim of independent act.

Counsel's Arguments to the Jury
In his second claim, Williams asserts that his trial counsel was ineffective because he told the jury that he believed Williams deserved to be in jail. Specifically, during opening and closing, defense counsel acknowledged that Williams had been convicted of a drug offense. At the postconviction evidentiary hearing, defense counsel explained this decision, asserting *8 that he was trying to use the State's argument that Williams was a big-time drug dealer to Williams' advantage by arguing that it would be ridiculous for Williams to risk $90,000 a week to have somebody killed over the theft of a mere $8000. Moreover, he wanted to ensure the jury knew Williams was already being punished for being a drug dealer. The postconviction court denied this claim, first noting that defense counsel did not concede to a crime which was at issue, but simply acknowledged a crime for which the defendant had already been convicted and used this concession "as a cornerstone of his defense." The court concluded that "[t]his tactic was not only reasonable, but even in retrospect, it was quite clever."
Williams challenges this ruling, contending that the Court has already condemned a similar argument in Clark v. State, 690 So.2d 1280 (Fla.1997). Contrary to such assertions, however, Clark is an extreme case, where defense counsel abdicated his responsibilities and essentially encouraged the jury to side with the State on the very point in contention, i.e., whether the defendant should be sentenced to death. Id. at 1283. Here, defense counsel simply conceded a point which the State had already pointed out and for which no additional punishment could be sought: that the defendant was a drug dealer. Moreover, defense counsel was clearly aware that the jury would be inclined to punish the defendant for being a drug dealer and thus aptly pointed out that the defendant was already serving a significant amount of time for this crime. Counsel even found a way to argue that the defendant's illegal activities would make it less likely that he ordered the codefendants to kill the victims. As this Court has stressed numerous times, "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000). We agree with the trial court that Williams has not shown how his counsel was ineffective relative to this claim and thus is not entitled to relief.

Counsel's Failure to Object
In his third claim, Williams asserts that his trial counsel was ineffective in failing to object to the State's closing arguments which asserted that it was uncontroverted that Williams was the boss of the drug operation and that the codefendants who were sent to Pensacola did what they did pursuant to Williams' instructions. The trial court denied the claim, finding that the statements did not involve Williams' right to remain silent and were not otherwise improper.
While a prosecutor may not make a comment which is fairly susceptible of being interpreted as referring to the defendant's failure to testify, see State v. Marshall, 476 So.2d 150, 153 (Fla.1985), this does not mean that he or she is prohibited from commenting on the uncontradicted nature of the evidence. As this Court elaborated in Rodriguez v. State, 753 So.2d 29 (Fla.2000),[2] "where the evidence is uncontradicted on a point that only the defendant can contradict, a comment on the failure to contradict the evidence becomes an impermissible comment on the failure of the defendant to testify." Id. at 38.
Williams first asserts that his trial counsel should have objected to the *9 prosecutor's comments regarding the fact that it was uncontested that Williams was the head of the drug operation. Such information, however, is not the type of evidence that only Williams could contradict. Moreover, this was a fact that even defense counsel conceded and attempted to use in Williams' favor. Williams also contends that his counsel was ineffective in failing to object to comments regarding the uncontested evidence relating to the crime scene. As the trial court pointed out, however, these comments did not implicate Williams' right to remain silent because it was undisputed that Williams was never at the crime scene and thus would not have been able to testify about these matters.

Counsel's Advice on Defendant Testifying
In his fourth claim, Williams contends that his trial counsel was ineffective because he provided erroneous advice that if Williams testified, the defense would lose opening and closing arguments. In support, Williams points to a letter in the file stating that Williams declined to testify that included a legal misstatement of the law that Williams "was advised by RJE [defense counsel] that the 1st and last closing would be traded for any testimony on his behalf."
During the postconviction hearing, defense counsel asserted that the memo to the file was prepared by his secretary, and this was a typographical error that she had made well after his conversation with Williams occurred. Defense counsel testified that he did not advise Williams that they would lose opening and closing if Williams testified and that Williams chose not to testify after defense witness Gregory Manning fared badly during the State's cross-examination. Williams disputed this version of events at the hearing, asserting that after Manning testified, defense counsel and Williams went into a little room to talk, and defense counsel stated that he wanted to give the opening and closing statement to the jury, but he would not get that opportunity if Williams testified. Defense counsel was then recalled and asked whether he was sure about his recollection of the events in light of the conflicting testimony. Defense counsel responded, "He'd just had someone testify in front of him, so I can be absolutely certain that I certainly did not tell him that." After weighing the evidence presented, the postconviction court denied the claim, finding that defense counsel's testimony was more persuasive.
This Court has often recognized a trial court's superior vantage point in being able to assess the credibility of the witnesses and hence defers to the trial court's finding on credibility so long as that finding is supported by competent, substantial evidence. See, e.g., Porter v. State, 788 So.2d 917, 923 (Fla.2001). In this case, the court found that defense counsel was the more credible witness, a decision which is amply supported by the surrounding circumstances. As the trial court's findings are supported by competent, substantial evidence, we affirm the denial of relief.

Recusal
Fifth, Williams contends that his trial counsel was ineffective because he failed to move for the trial judge's recusal, as Williams requested. At the postconviction evidentiary hearing, defense counsel asserted that he did not file such a motion because he did not believe that he had adequate grounds. Moreover, he did not believe that the trial judge would override any life recommendation because Williams was in a different position than his codefendants and was not even in Pensacola at the time of the killings. He also felt that he could not seek recusal just because of concerns of an override. The postconviction *10 court denied this claim, finding that the grounds for disqualification were legally insufficient to grant a motion if it had been presented and therefore defense counsel's performance was not lacking.
Williams' only basis for requesting a motion to recuse the trial judge was Williams' fear that the trial judge was going to override a potential jury recommendation of life imprisonment as to Williams because the trial judge had already imposed the death sentences in the cases of Williams' three codefendants. Defense counsel did not dispute Williams' testimony that Williams was very concerned about the trial judge's overrides in the other cases. In fact, defense counsel testified that the trial judges in the circuit, and this trial judge in particular, were prone to order overrides.
As this Court has recognized, however, a motion to disqualify a judge
"must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy." Jackson v. State, 599 So.2d 103, 107 (Fla.1992); Gilliam v. State, 582 So.2d 610, 611 (Fla.1991); Dragovich v. State, 492 So.2d 350, 352 (Fla.1986). The motion will be found legally insufficient "if it fails to establish a well-grounded fear on the part of the movant that he will not receive a fair hearing." Correll v. State, 698 So.2d 522, 524 (Fla.1997). The fact that the judge has made adverse rulings in the past against the defendant, or that the judge has previously heard the evidence, or "allegations that the trial judge had formed a fixed opinion of the defendant's guilt, even where it is alleged that [t]he judge discussed his opinion with others," are generally considered legally insufficient reasons to warrant the judge's disqualification. Jackson, 599 So.2d at 107[.]
Rivera v. State, 717 So.2d 477, 480-81 (Fla.1998). Here, as defense counsel felt that he did not have a sufficient basis upon which to file such a motion, we conclude he was not ineffective in failing to file a motion which would lack a good-faith basis. See State v. Retalic, 902 So.2d 315, 317 (Fla. 5th DCA 2005) (denying claim of ineffective assistance of counsel where counsel did not file motion to suppress because he believed he lacked a good faith basis to argue such a claim). A trial judge's action in other cases or a reputation among lawyers for certain sentencing practices are simply legally insufficient reasons to disqualify a trial judge. Other cases may be distinguished on the facts or law, and "reputation" for certain sentencing practices will no doubt exist for all judges, but it is simply insufficient to remove a judge from a case.

Counsel's Failure to Present Mitigation Evidence
Next, Williams asserts that the trial court erred in denying his claim that defense counsel was ineffective in failing to present a mental health expert's report, despite the fact that the report outlined substantial evidence of mitigation which would have legally prevented an override of the jury's life recommendation regardless of the trial judge's personal inclinations.
Williams asserts on appeal that his counsel was ineffective in failing to present the mitigating evidence of Dr. James D. Larson, despite the fact that, long before sentencing, defense counsel had this mental health expert's evaluation and detailed report. Among other findings, Dr. Larson concluded that Williams had an IQ of 75 and was in the borderline range for mental retardation. Dr. Larson further calculated that due to his mental deficits, Williams had a personality disorder and functioned emotionally and mentally at the age level *11 of a thirteen or fourteen-year-old. The report reflects that the defendant had an impoverished and abusive childhood, an erratic school record, was frequently beaten, sometimes with an extension cord, and his parents were alcoholics who frequently drank to the point of intoxication. Williams himself also had a lengthy drug abuse history. These circumstances eventually caused Williams to leave school at age sixteen and to enter the drug culture that thrived in his "ghetto" neighborhood in Miami. Further, due to the mental deficits Dr. Larson found, he concluded that Williams would not even be recommended for employability.
The trial judge denied this claim, finding that Williams failed to demonstrate prejudice. The trial judge held that because trial counsel was successful in securing a life recommendation from the jury, the only relevant question was whether this mitigating evidence would have made a difference to him since he was also the sentencing judge in the case. He then found that the evidence contained in the report would not have made a difference to his decision to override the jury's life recommendation. Hence, the trial judge concluded that Williams was not prejudiced by the failure of counsel to utilize the report because its presentation would not have changed the judge's mind to override the jury's recommendation.
As an initial matter, we find that the trial judge applied an erroneous standard to his prejudice analysis. The personal and subjective analysis applied by the trial judge is legally flawed. As this Court has held:
It is of no significance that the trial judge stated that he would have imposed the death penalty in any event. The proper standard is whether a jury recommending life imprisonment would have a reasonable basis for that recommendation. If so, the trial judge could not override the jury's recommendation....
Hall v. State, 541 So.2d 1125, 1128 (Fla. 1989). In other words, the proper standard for prejudice is whether the omitted evidence would have provided a reasonable basis for a life recommendation and sentence.
In turning to the merits of the claim, Williams raises two issues: whether his counsel was ineffective in failing to present this evidence to the jury; and whether counsel was ineffective in failing to present this report to the judge at the Spencer[3] hearing. Williams acknowledges that the jury returned a life recommendation, and hence he cannot demonstrate prejudice for his counsel's decision to fail to present this evidence to the jury. We agree. However, we reach a different conclusion as it relates to Williams' claim that his counsel was ineffective in failing to present this evidence to the trial judge during the Spencer hearing conducted after the jury returned a life recommendation.
To prove a claim of ineffectiveness of counsel under Strickland, a defendant must demonstrate an act of ineffectiveness by counsel and prejudice resulting from that act. We conclude that the circumstances of this case present a classic case of ineffectiveness and prejudice. Under Florida law, defense counsel in a capital proceeding has a fundamental obligation to both diligently investigate and present evidence of mitigation in the penalty phase of the proceedings. In this case, the record demonstrates that a defense lawyer who is *12 presumed to know the law utterly failed to present to the sentencing court mitigation evidence that defense counsel literally had in his hand.
Further, in this case, as we have noted in our discussion on the recusal issue, Williams' defense lawyer was aware that the presiding trial judge had already failed to follow life recommendations by other juries in the cases of Williams' codefendants. In fact, his client had repeatedly expressed this concern to him. Defense counsel also knew that this same trial judge had failed to follow jury recommendations for life in other unrelated capital cases. In other words, defense counsel was well aware, at the time of Williams' sentencing, that he needed to ensure that there was sufficient mitigating evidence in the record to support a jury's recommendation of life due to this trial judge's practice of overriding jury life recommendations. Yet, in the face of a very high risk, if not virtual certainty, that this trial judge would not follow the jury's life recommendation for Williams, defense counsel failed to present the significant mitigation evidence contained in Dr. Larson's report.
Defense counsel gave conflicting testimony on this issue. He first asserted that he thought he had alluded to this evidence at the Spencer hearing before the trial judge. When he was asked about Dr. Larson's report, defense counsel asserted that he thought he referred to it, but he did not believe that he presented the report itself during the Spencer hearing and did not discuss it in the sentencing memorandum because he did not think it was necessary. He also asserted that he did not believe that Williams was mentally retarded, although the report itself did not find retardation, only mental impairment and low mental age.[4]
It appears counsel's decision to withhold Dr. Larson's evidence was based upon counsel's overconfidence that a life sentence would be imposed and his erroneous belief that it was not necessary since his research seemed to show that this Court generally did not approve of overrides. However, counsel clearly missed the mark in overlooking our extensive case law that consistently requires some reasonable evidentiary basis for a life sentence in order to bar an override. Under Florida law, a trial judge is prohibited from rejecting a jury's recommendation of life imprisonment if there is competent evidence of mitigation supporting a life recommendation at the time of sentencing. Stevens v. State, 552 So.2d 1082, 1085 (Fla. 1989); Tedder v. State, 322 So.2d 908, 910 (Fla.1975).
This Court has previously considered circumstances similar to those involved herein and found that counsel was ineffective because counsel failed to present evidence of mitigation to the judge which would have provided a reasonable basis for the jury's life recommendation. For example, in Stevens, after a jury returned a life recommendation for the defendant, the trial judge informed counsel that he intended to override this recommendation. 552 So.2d at 1085. Counsel then chose not to make any arguments or present additional *13 mitigating evidence to the judge in support of the life recommendation. Id. Similar to this case, four relevant aggravators applied, including HAC, and there was little to no mitigation. Id. at 1085 & n. 6. During the postconviction proceedings, trial counsel defended his actions, asserting that he did not believe that he could have persuaded the trial judge to impose a life sentence and, at any rate, believed a life recommendation from the jury was a guarantee that this Court would overturn the death sentence, if imposed. Id. at 1085. This Court held that trial counsel was ineffective in failing to investigate and present mitigating evidence, including evidence that would have shown that Stevens spent his childhood raised in severe poverty and neglect, was physically abused by both of his parents, and still became a responsible family man until the time of his arrest. Id. at 1085-88. See also Torres-Arboleda v. Dugger, 636 So.2d 1321, 1325-26 (Fla.1994) (holding that counsel was ineffective in failing to discover and present evidence that a coperpetrator received disparate treatment, the defendant grew up in abject poverty, the defendant was a good child, and the defendant supported his family after his father died  evidence which could have supported the jury's life recommendation); Heiney v. State, 620 So.2d 171, 174 (Fla.1993) (holding that counsel was ineffective for failing to present mitigating evidence at sentencing where mitigating factors could have established reasonable basis to uphold jury's life recommendation so as to make jury override by court improper). All of these cases involved defense counsel's failure to present mitigating evidence similar to that alluded to in the mental health expert's report involved herein.
Under these circumstances, we conclude Williams has demonstrated deficient performance. As our case law has consistently emphasized, defense counsel has an obligation to investigate and present evidence of mitigation even in ordinary circumstances. However, in this case, because of the known and substantial risk of an override, defense counsel's responsibility was heightened. In addition, it is apparent that defense counsel simply had nothing to lose in presenting this evidence at the Spencer hearing, thereby ensuring that such evidence would be in the record on appellate review. Instead, on appellate review this Court concluded there was only de minimis mitigation evidence in the record and not enough to provide a reasonable basis for a life recommendation and sentence, even though this Court struck two of the aggravators found by the trial court.
Of course, under the United States Supreme Court's decision in Strickland, Williams must also show that he was prejudiced by his counsel's ineffectiveness in failing to present the mitigating evidence in Dr. Larson's detailed report. This issue turns on an evaluation of the impact that the presentation of the mitigation evidence would have, i.e., whether a jury's recommendation for life could properly have been set aside by the trial judge if the evidence had been presented. We have already discussed and found error with the trial judge's application of a subjective evaluation of this issue.
In asserting his claim of prejudice, Williams first correctly asserts that because this is a jury override case, the trial court would essentially be precluded from overriding the jury's life recommendation unless the court could state that "the facts suggesting a sentence of death [were] so clear and convincing that virtually no reasonable person could differ." Tedder, 322 So.2d at 910. In other words, to show prejudice in this type of case, Williams must show that his counsel failed to present *14 evidence which would support a life sentence and constitute "a reasonable basis in the record to support the jury's [life] recommendation." Stevens, 552 So.2d at 1085 ("If there is a reasonable basis in the record to support the jury's recommendation, an override is improper.").
As discussed above, it is apparent that the omitted mental health report would have provided additional mitigation relating to at least three significant categories of mitigation: (1) evidence concerning Williams' childhood, including information that he was raised in an impoverished and abusive home, where his mother would beat him with an extension cord when "the belt didn't do no good"; (2) he had a lengthy drug and substance abuse history; and (3) the mental health expert's opinion that Williams' IQ was 75 and that he operates on the mental level of a thirteen-and-a-half-year-old male. Our case law has consistently recognized the importance and significance of this kind of mitigation evidence. See, e.g., Torres-Arboleda; Heiney; Stevens. Further, as in these prior cases, we conclude that the important mitigation evidence that was available but was not presented by defense counsel would have provided an objective and reasonable basis for the jury's recommendation and a sentence of life. Under our case law, it is the existence of such evidence of mitigation in the record that operates to provide a basis for a life recommendation and, hence, preclude a trial judge's override of the jury's decision.
In fact, in the initial appeal of this case, this Court noted, in dismissing the case for mitigation and approving the override of the jury's life recommendation, that the evidence of mitigation was virtually nonexistent. Williams, 622 So.2d at 464. Because of this absence of mitigation, we approved the trial judge's override of the jury's findings even while holding that the trial judge had erroneously found two aggravators. Id. In the absence of any significant evidence of mitigation we concluded these erroneous findings were harmless. Id. That sparse record of mitigation contrasts sharply with the substantial evidence of mitigation we now know existed but was not placed before the court. Accordingly, because we know that significant mitigation evidence existed here and that only defense counsel's neglect prevented its introduction, we conclude that defendant has sufficiently demonstrated both prongs of Strickland, and, hence, the trial court erred in denying relief.

Cocounsel
In his seventh claim, Williams requests that this Court consider whether the Court should automatically mandate that cocounsel be appointed in every death case. However, Florida Rule of Criminal Procedure 3.112(e) currently provides a trial court with the discretion to appoint cocounsel in all capital trials. We conclude Williams has failed to make any showing that this Court should modify the rule to require the mandatory appointment of cocounsel.

Cumulative Error
Next, Williams contends that he is entitled to a new trial as to his guilt based on the cumulative errors he asserts. We disagree. Where allegations of individual error are without merit, as we have determined here, a cumulative error argument based thereupon must also fail. See Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999).

Trial Judge's Notes
In his ninth claim, Williams asserts that the trial judge erred in denying his motion to reconstruct the file because he had a right to review the trial judge's personally created records relating to this *15 case and to depose the trial judge and his staff to reconstruct those personal files which were inadvertently destroyed. Williams has failed to establish his entitlement to the trial judge's personally created notes and files relating to the trial judge's decision to impose the death penalty. Florida Rule of Judicial Administration 2.420, which provides public access to judicial records, specifically exempts from the parameters of the rule "[t]rial and appellate court memoranda, drafts of opinions and orders, court conference records, notes, and other written materials of a similar nature prepared by judges or court staff acting on behalf of or at the direction of the court as part of the court's judicial decision-making process." See Fla. R. Jud. Admin. 2.420(c)(1). This is the exact type of material which Williams is seeking. It is clear that the court below did not err in denying Williams' request.

Recusal in Postconviction
Williams also contends that the circuit court erred because the trial judge failed to recuse himself in the postconviction proceedings. Williams presented five tenuous grounds for recusal: (1) one of the claims presented in the 3.850 motion was a predisposition or bias of the trial judge to sentence Williams to death; (2) the trial judge was a material witness to the case based on the claim of bias and based on the motion to reconstruct the record and for discovery of the trial judge; (3) the trial judge used virtually identical sentencing orders with regard to Williams and his codefendants, which showed a bias in favor of a death sentence; (4) the trial judge commented at defendant's sentencing that "no case warrants death if this doesn't, as were the other cases"; and (5) the trial judge made some comments when the codefendants were tried that indicated that he did not believe witness Gwen Robinson, whom Williams had intended to call in his trial. The circuit court denied the motion as legally insufficient. We find no error. Most of Williams' claims essentially involve one allegation: the trial judge previously overrode life recommendations as to Williams' three codefendants. However, as addressed above, we have determined that this allegation standing by itself is insufficient. Accordingly, he is not entitled to relief.

Ring
In his final postconviction claim, Williams asserts that he is entitled to relief based on Ring.[5] In Johnson v. State, 904 So.2d 400 (Fla.2005), this Court held that Ring does not apply retroactively in postconviction cases, even assuming that it affected Florida law. Id. at 402. Accordingly, this Court has denied Ring claims, even in cases where the judge overrode a jury's life recommendation. See, e.g., Marshall v. Crosby, 911 So.2d 1129, 1134-35 (Fla.2005) (denying habeas relief on Ring claim in override case); Washington v. State, 907 So.2d 512, 513-14 (Fla.2005) (denying postconviction relief on Ring claim in override case). Hence, Williams would not be entitled to relief on this claim, either as presented in his postconviction case or in his habeas petition. However, since we have reduced Williams' sentence to life, this claim is moot.

CONCLUSION
For the foregoing reasons, we affirm the circuit court's denial of Williams' rule 3.851 motion as to the guilt phase issues and deny relief as to his habeas petition. However, we reverse the trial court's ruling *16 on the claim of ineffectiveness at the penalty phase, and we remand with directions that defendant's sentences be reduced to life. Nothing in this decision should be construed to prohibit the trial court from considering the imposition of consecutive sentences for the various crimes and convictions involved.
It is so ordered.
ANSTEAD, PARIENTE, and QUINCE, JJ., and E.B. BROWNING, JR., Associate Justice, concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which LEWIS, C.J., and CANTERO, J., concur.
BELL, J., recused.
WELLS, J., concurring in part and dissenting in part.
I concur in the majority's decision affirming the postconviction court's rulings. However, I dissent as to the portion that reverses the postconviction court's denial of relief on Williams' claim that his trial counsel was ineffective in failing to present to the trial court available evidence of mitigation.
The majority fails to acknowledge or apply this Court's precedent in reviewing the trial court's denial of postconviction relief on this issue. This Court's precedent which is on point is Routly v. State, 590 So.2d 397, 401 (Fla.1991). In Routly, a case also involving a jury override, Routly presented a postconviction claim asserting that his counsel was ineffective in failing to present mitigation evidence, particularly since that evidence would have been a sufficient basis to support the jury's recommendation of life imprisonment. This Court stated:
[T]he judge who presided over Routly's 3.850 motion was the same judge who presided over his trial and imposed the death sentence. In imposing the death sentence, the trial judge found five aggravating factors, all of which were affirmed on appeal. The judge found no mitigating factors. In ruling on the instant claim, the judge found that the failure to present this evidence at the sentencing phase had no effect on the sentence. This finding is entitled to considerable weight. Francis v. State, 529 So.2d 670, 673 n. 9 (Fla.1988).
Id. at 402. The trial court here did rely on this Court's precedent. The trial court's order stated:
Even if Defendant's ninth claim were well-taken, it would not merit relief. Courts have approved strategic decisions not to present such information at trial, where trial counsel has conducted a reasonable investigation into defendant's mental health history prior to trial. Asay v. State, 769 So.2d 974, 985 (Fla.2000). In addition, a "first evaluation is not rendered less than competent simply because appellant has been able to provide testimony to conflict with the first evaluation." Asay, at 986, citing Jones v. State, 732 So.2d 313 (Fla.1999).
Further, this claim can only apply to the Court's decision in the penalty phase, as it is clear that trial counsel was successful, through the presentation of other mitigating evidence, in securing a life recommendation from the jury. See Lusk v. State, 498 So.2d 902, 905 (Fla.1986) ("[T]he jury's recommendation of life cannot be alleged to have been produced by counsel's ineffectiveness"); see also Buford v. State, 492 So.2d 355 (Fla.1986) (Appellant's contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase is repudiated by the fact that the jury recommended life, and counsel could not be considered ineffective for relying on the jury recommendation *17 and failing to present further mitigating evidence to the judge). Therefore, the Court's inquiry must center on whether this mitigation evidence would have resulted in a different decision by the Court.

Francis v. State, 529 So.2d 670 (Fla. 1988), is instructive. There, as here, the trial judge overrode the jury's life recommendation. The Florida Supreme Court emphasized the significance of the overriding sentencing judge hearing the post-conviction motion:
"Who better than he [the sentencing judge], could determine whether failure to introduce this evidence prejudiced Francis sufficiently to meet the Strickland v. Washington test? Postconviction relief motions are not abstract exercises to be conducted in a vacuum, and this finding is entitled to considerable weight." Id. at 674, 104 S.Ct. 2052.
Defendant makes the assertion that the introduction of Dr. Larson's examination results would have made a difference in the Court's decision to impose the death penalty. The Court does not agree. Initially, trial counsel testified at [the] evidentiary hearing that Williams told him that he did not want Dr. Larson's results presented which is corroborated by the trial record itself. Dr. Larson testified that there was nothing to indicate that Williams should have been referred for further mental evaluation, and that he had discussed these findings with Mr. Etheridge. See Reed v. State, 640 So.2d 1094, 1097 (Fla.1994) ("When a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.")
Williams' IQ score is not in the retarded range and trial counsel found him to be "quite bright" and "certainly" brighter than the IQ tests showed. Evidence at trial indicated that Defendant ran a drug empire throughout the state of Florida. Accordingly, Dr. Larson testified that he found it hard to reconcile the accuracy of the scores with Defendant's ability to run his "business." Counsel testified that Dr. Larson told him that Defendant "was at the very least a very street smart person." Williams' mother also testified at trial that Williams "had a normal childhood" and he was "a good boy ... a normal kid." Furthermore Dr. Larson testified that he believed a complete examination had been done and that nothing in the initial examination of Defendant indicated that additional tests were needed.
Accordingly, the Court has heard no testimony which would have borne significantly on its decision. Because Defendant has failed to carry his burden of showing prejudice, he is not entitled to relief on this claim.
(Footnotes omitted.)
I do not join in reversing the trial court's decision, which is based upon this Court's precedent. The majority not only fails to give the trial court's finding "considerable weight," the majority gives the trial court's finding as to prejudice no weight. If this precedent were followed, the trial court would be affirmed, not reversed.
The cases to which the majority cites are not on point. This Court's decision in Hall v. State, 541 So.2d 1125, 1128 (Fla. 1989), was a decision issued before this Court's decision in Routly. Additionally, Hall did not concern the issue of prejudice with respect to a jury override but rather the issue of the trial judge's failure to admit mitigation evidence before a jury and whether the trial court's evidentiary error was harmful. Hall did not recede *18 from this Court's decision in Francis v. State, 529 So.2d 670 (Fla.1988), to which the trial court cited and which was expressly endorsed by this Court in Routly subsequent to Hall.
Moreover, even if the trial court erred as to prejudice, I cannot agree with the majority that there was a basis upon which the majority could properly find trial counsel to have been ineffective. First, it is beyond dispute that this experienced trial counsel was not ineffective in the trial before the jury since counsel obtained a life recommendation for his client. See Buford v. State, 492 So.2d 355, 359 (Fla. 1986) (appellant's contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase is refuted by the fact that the jury recommended life).
Second, unlike the cases cited by the majority  Stevens v. State, 552 So.2d 1082 (Fla.1989), Torres-Arboleda v. Dugger, 636 So.2d 1321 (Fla.1994), and Heiney v. State, 620 So.2d 171, 174 (Fla.1993)  this is not a case in which trial counsel failed to investigate and discover evidence. This is a case in which trial counsel had the evidence available and made a judgment not to present the evidence to the trial court for the trial court's consideration in sentencing at the Spencer[6] hearing. The sole issue before this Court on the issue of whether trial counsel was ineffective is the issue of whether the judgment made by trial counsel was unreasonable to the extent set out in Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
During the postconviction evidentiary hearing, Williams' counsel was questioned as to his decision to not present Dr. Larson's report to the trial judge. Counsel expressed his concerns as to the accuracy of the expert's report, explaining that based on his personal observations, he did not believe Williams was "mentally retarded in any way at all." Counsel did not have any difficulty communicating with Williams, found Williams very likable, and thought he was brighter than the tests showed him to be. Moreover, counsel also had some concerns as to whether the report could hurt Williams' case before the trial judge because it "showed he knew what he was doing and understood what was going on with the case." It was based on these conflicting concerns that counsel, after a consultation with Williams himself, decided against presenting this same report to the jury.
This is not a case where counsel failed to investigate or failed to seek expert advice where that advice was necessary  this is a case where counsel had investigated and had an expert report. However, counsel simply did not believe that the report was consistent with his knowledge of the case, what he observed about Williams during the course of the trial, and what he knew the trial judge had observed about Williams. From an objective reading, even without the extensive observations as to Williams, the report was extremely difficult to reconcile with the facts already introduced during the trial. Specifically, Dr. Larson found that Williams was in the borderline range for mental retardation and that Williams operated on the level of a thirteen-and-a-half year-old male. This is juxtaposed against the evidence presented at trial, which showed that Williams was running a statewide illegal operation that stretched from South Florida to Pensacola to Jacksonville. In the original "Order Stating Reasons for Imposition of Death Sentence," the trial judge specifically found that the evidence presented at trial belied any notion that Williams was learning disabled, particularly in light of *19 the fact that he "successfully managed the nefarious activities of an illicit enterprise spanning the entirety of Florida which grossed weekly revenues of at least $70,000."[7]
We expect lawyers to make a good-faith judgment and to not present evidence that they do not believe conforms to the facts. See, e.g., R. Regulating Fla. Bar 4-3.3(c) ("A lawyer may refuse to offer evidence that the lawyer reasonably believes is false."). I cannot say that counsel did not have a reasonable basis for believing the report was inaccurate, particularly in light of the evidence showing that Williams was the head of an illegal statewide drug operation that grossed well over $70,000 a week (or $3,640,000 annually).
Even more relevant for the present issue than the ethical consideration is that this Court's review of such claims must adhere to the rules set out by the United States Supreme Court in Strickland. In reviewing whether counsel was ineffective, our review must be highly deferential and not second-guess judgments made by counsel. As the Supreme Court has stated:
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134[, 102 S.Ct. 1558, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, [350 U.S., 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)].
Strickland, 466 U.S. at 689, 104 S.Ct. 2052. The Strickland Court continued, reiterating its holding that "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690, 104 S.Ct. 2052.
The majority here engages in a classic twenty-twenty hindsight analysis about a strategic choice made by an experienced attorney who had the evidence in hand; who knew and had personal, ongoing, in-flesh observations of the defendant; and had experience in cases before this trial judge. The majority does not afford to trial counsel the deference and the presumption of adequate assistance that Strickland directs be given.
For these reasons, I dissent from this portion of the opinion.
LEWIS, C.J., and CANTERO, J., concur.
NOTES
[1] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[2] Although Rodriguez was issued well after the trial here, even under Rodriguez, no constitutional violation occurred.
[3] Spencer v. State, 615 So.2d 688, 691 (Fla. 1993) (trial court should conduct a separate sentencing proceeding in which additional evidence of mitigation not presented to the jury may be received).
[4] Moreover, much of defense counsel's testimony regarding this decision seemed to indicate that he was confused as to the report itself. At one point he stated that he did not believe the report was accurate because, to him, Williams did not appear to be mentally retarded. However, the report did not actually find Williams was mentally retarded. Rather, it demonstrated that Williams had significant problems in his intellectual functioning and that Williams was in the borderline range, while other aspects of his intelligence and memory were determined to be within the normal range. Of course, the report also contained evidence of substantial mitigation other than mental health issues.
[5] He makes the exact same argument in his habeas petition  the only claim presented in that case.
[6] Spencer v. State, 615 So.2d 688 (Fla. 1993).
[7] The testimony at the postconviction proceeding showed that even Dr. Larson recognized the difficulty in reconciling the IQ scores against Williams' ability to run a widespread drug operation.