PER CURIAM.
Michael Coleman appeals an order of the circuit court denying his motion to vacate his convictions of first-degree murder and sentences of death filed under Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habe-as corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we reverse the circuit court’s denial of postconviction relief *1213 as it pertains to Coleman’s claim of ineffective assistance of counsel during the penalty phase because we conclude that counsel rendered ineffective assistance of counsel during the penalty phase when counsel failed to investigate, develop, and present available mitigating evidence that would have legally precluded an override of the jury’s life recommendation. Therefore, we vacate Coleman’s death sentences and remand for imposition of life sentences instead. We deny Coleman’s petition for habeas corpus.
FACTUAL AND PROCEDURAL HISTORY
Michael D. Coleman was convicted of the first-degree murders of Derek Hill, Morris Douglas, Michael McCormick, and Mildred Baker and of the attempted first-degree murder of Amanda Merrell. Coleman v. State, 610 So.2d 1283, 1284 (Fla.1992). The jury recommended life by a vote of six to six. Following that recommendation, the trial court overrode the jury recommendation and imposed four death sentences. Id. at 1287. On direct appeal, this Court affirmed Coleman’s convictions and sentences of death. Id. at 1288. There, Coleman raised five issues.[1] There, this Court detailed the facts surrounding the murders:
Michael Coleman, Timothy Robinson, and brothers Bruce and Darrell Frazier were members of the “Miami Boys” drug organization, which operated throughout Florida. Pensacola members of the group moved a safe containing drugs and money to the home of Michael McCormick from which his neighbors Derek Hill and Morris Douglas stole it. Hill and Douglas gave the safe’s contents to Darlene Crenshaw for safekeeping.
Late in the evening of September 19, 1988[,] Robinson, Coleman, and Bruce Frazier, accompanied by McCormick, pushed their way into Hill and Douglas’ apartment. They forced Hill and Douglas, along with their visitors Crenshaw and Amanda Merrell, as well as McCormick, to remove their jewelry and clothes and tied them up with electrical cords. Darrell Frazier then brought Mildred Baker, McCormick’s girlfriend, to the apartment. Robinson demanded the drugs and money from the safe and, when no one answered, started stabbing Hill. Crenshaw said she could take them to the drugs and money and left with the Fraziers. Coleman and Robinson each then sexually assaulted both Merrell and Baker.
After giving them the drugs and money, Crenshaw escaped from the Frazi-ers, who returned to the apartment. Coleman and Robinson then slashed and shot their five prisoners, after which they and the Fraziers left. Despite having had her throat slashed three times and having been shot in the head, Mer-rell freed herself and summoned the authorities. The four other victims were dead at the scene.
*1214 Merrell and Crenshaw identified their abductors and assailants through photographs, and Coleman, Robinson, and Darrell Frazier were arrested eventually. A grand jury returned multiple-count indictments against them, charging first-degree murder, attempted first-degree murder, armed kidnapping, armed sexual battery, armed robbery, armed burglary, and conspiracy to traffic. Among other evidence presented at the joint trial, the medical examiner testified that three of the victims died from a combination of stab wounds and gunshots to the head and that the fourth died from a gunshot to the head. Both Crenshaw and Merrell identified Coleman, Robinson, and Frazier at trial, and Merrell identified a ring Coleman gave to a girlfriend as having been taken from her at the apartment. Several witnesses testified to drug dealing in Pensacola and to the people involved in that enterprise. Coleman and Robinson told their alibis to the jury with Coleman claiming to have been in Miami at the time of these crimes and Robinson claiming he had been in New Jersey then.
Id. at 1284-85 (footnotes omitted).
In sentencing Coleman to death, the trial court found the existence of five aggravating circumstances. Id. at 1287.[2] The trial court did not find any statutory mitigating circumstances and found the existence of one nonstatutory mitigator. Id.[3] After considering the aggravating and mitigating circumstances, the trial judge concluded that the “jury’s recommendation could have been based only on minor, non-statutory mitigating circumstances or sympathy,” and held that the life recommendation was not reasonable under the standard of Tedder v. State, 322 So.2d 908 (Fla.1975). Coleman, 610 So.2d at 1287. The trial judge overrode the jury recommendation and imposed four death sentences, stating that justification for the imposition of death was “so clear and convincing that virtually no reasonable person could differ.” Id. On direct appeal, this Court struck the avoid or prevent lawful arrest aggravator after finding the evidence insufficient to support it, but found that the other four aggravators were supported by the record. Id. at 1287. This Court also found that the trial court’s override was proper under Tedder because of the lack of mitigation presented in the case. Coleman, 610 So.2d at 1287.
MOTION FOR POSTCONVICTION RELIEF
On March 24, 1997, Coleman filed a Motion to Vacate Judgments of Conviction and Sentence with Special Request for Leave to Amend.[4] On February 3, 2000, *1215 Coleman again filed a Motion to Vacate Judgment of Conviction and Sentence with Special Request for Leave to Amend.[5] A *1216 Huff[6] hearing was conducted on July 25, 2000. The postconviction court conducted an evidentiary hearing on January 24 and 25, 2001. Subsequently, Coleman filed a Second Amended Motion to Vacate on May 10, 2004.[7] The postconviction court denied Coleman’s motion for postconviction relief and both amendments. In response, on August 2, 2004, Coleman filed a Notice of Appeal with this Court. On August 9, 2004, he filed an Amended Notice of Appeal.
On April 18, 2005, Coleman filed a Motion to Relinquish Jurisdiction for a Determination of Mental Retardation. On April 21, 2005, Coleman filed a Motion to Vacate Judgment and Sentence with Request to Amend.[8] This Court granted Coleman’s motion to relinquish on September 23, 2005, and on July 17, 2007, the postconviction court conducted an evidentiary hearing on the Atkins claim. On August 1, 2007, the postconviction court issued an order finding Coleman is not mentally retarded and denying Coleman postconviction relief. This appeal[9] and accompanying petition for habeas corpus[10] followed.
INEFFECTIVE ASSISTANCE OF COUNSEL
Coleman contends that his trial counsel, Ted Stokes, rendered ineffective assistance of counsel during the penalty phase because Stokes failed to investigate, develop, and present available mitigating evidence that would have legally precluded an override of the jury’s life recommendation.
Following the United States Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range *1217 of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test if it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo. See Sochor v. State, 888 So.2d 766, 771-72 (Fla.2004).
There is a strong presumption that trial counsel’s performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id. In Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000), this Court held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” It is under this legal framework that Coleman’s claim is addressed.

Deficiency

Coleman argues that the postcon-viction court erred in finding that Stokes’ performance was not deficient under Strickland. For the reasons expressed below, we agree.
Under Strickland, “counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052. This Court has held that “[a]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant’s background, for possible mitigating evidence.” Rose v. State, 675 So.2d 567, 571 (Fla.1996) (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.1994)); see also State v. Riechmann, 777 So.2d 342, 350 (Fla.2000). “In the past, this Court has found ineffectiveness where no attempt was made to investigate mitigation even though substantial mitigating evidence could have been presented.” Rodriguez v. State, 919 So.2d 1252, 1264 (Fla.2005). To succeed on an ineffective assistance of penalty phase counsel claim, the claimant must demonstrate that counsel performed deficiently and that such deficiency prejudiced his defense. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Pursuant to Strickland, trial counsel has an obligation to conduct a reasonable investigation into mitigation. See id. at 691, 104 S.Ct. 2052; see also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Counsel’s decision to not present mitigating evidence may be a tactical decision properly within counsel’s discretion. See Brown v. State, 439 So.2d 872, 875 (Fla.1983) (“The choice *1218 by counsel to present or not present evidence in mitigation is a tactical decision properly within counsel’s discretion.”); Valle v. State, 705 So.2d 1331, 1335 n. 4 (Fla.1997) (same); Gorham v. State, 521 So.2d 1067, 1070 (Fla.1988) (same). When evaluating claims that counsel was ineffective for failing to investigate or present mitigating evidence, we have phrased the defendant’s burden as showing that counsel’s ineffectiveness “deprived the defendant of a reliable penalty phase proceeding.” Asay v. State, 769 So.2d 974, 985 (Fla.2000) (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). Further, as the United States Supreme Court stated in Wiggins:
[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.
[[Image here]]
... [O]ur principal concern in deciding whether [counsel] exercised “reasonable professional judgmen[t]” is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable. In assessing counsel’s investigation, we must conduct an objective review of their performance, measured for “reasonableness under prevailing professional norms,” which includes a context-dependent consideration of the challenged conduct as seen “from counsel’s perspective at the time.”
539 U.S. at 521-23, 123 S.Ct. 2527 (citations omitted) (fifth alteration in original) (quoting Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052); see also Sochor, 883 So.2d 766.
In Florida, “[w]e require and encourage death penalty counsel to conduct reasonable investigations as are appropriate to ensure that he or she can properly counsel and inform a defendant with regard to the nature and extent of the mitigation that may be viable in the case.” Hannon v. State, 941 So.2d 1109, 1125 (Fla.2006). Defense counsel’s “particular decision not to investigate mitigation must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.” Id. (quoting Wiggins, 539 U.S. at 521-22, 123 S.Ct. 2527). In Coleman’s case, despite there being a significant amount of mitigation as evidenced by the 2001 postconviction evidentiary hearing, trial counsel did not investigate or present mitigation.
At the 2001 postconviction evidentiary hearing, postconviction counsel called three witnesses to testify regarding mitigation that Stokes allegedly failed to uncover, develop, and present during the penalty phase — Marie Wims, Coleman’s maternal aunt, Dolly Leverson, Coleman’s mother, and Dr. Jethro Toomer. The mitigating evidence presented at Coleman’s 2001 postconviction evidentiary hearing was substantial and revealed that Coleman (1) came from an impoverished background, (2) had an unstable childhood, (3) had a poor relationship with his father, (4) underwent a traumatic experience when he lost his father at a young age, (5) was traumatized by the loss of his half-brother, (6) suffered from negative experiences, such as riots and violence, at a young age, (7) has an erratic school record and history of special education placement, (8) has a long history of substance abuse from a young age, (9) was molested as a child, (10) suffered a severe head injury at the age of *1219 eighteen, and (11) suffers from mental health illness and deficiencies.
Stokes also testified at the 2001 postcon-viction evidentiary hearing. His testimony revealed that he was appointed to represent Coleman. He admitted that he did not retain an investigator or seek a mental health evaluation on Coleman’s behalf because he claimed he believed Coleman’s alibi defense. Stokes pursued the alibi defense Coleman provided. Coleman, his mother, and his girlfriend testified that Coleman was in Miami at the time the murders occurred. Stokes could not remember whether the records he used to show Coleman was in Miami were actually a day off, placing Coleman in Miami on the afternoon of September 20, one day after the murders occurred.
Coleman grew up in Liberty City, which Stokes testified was “probably the most horrendous place [Stokes had] ever been.” Yet, Stokes admitted that he spent more time preparing for the guilt phase than he did for the penalty phase. After the jury returned a guilty verdict, Stokes requested a continuance so he could present an expert from the University of Florida. The request was denied. The penalty phase began the next day. Stokes admitted that he never inquired into whether Coleman (1) was in special education classes; (2) abused drugs; or (3) suffered a head injury. Stokes claimed that he relied on the information he obtained from Coleman and Coleman’s fiiends and family in developing mitigation for the penalty phase. At the 2001 postconviction evidentiary hearing, Stokes admitted that he did not spend much time on the penalty phase:
I would say primarily because, I mean, I really was convinced that the guy was not there, I mean, I really was. And, you know, we made preparations just by having his mother and his girlfriend available to testify about his past. But we — you know, we didn’t really have time to do any elaborate preparations for the penalty phase.
Stokes testified that he would have conducted the penalty phase differently if Mr. Coleman had admitted his guilt:
Q. Did you see any reason in his defense, if he was not there, to try to develop mitigating evidence to present to a jury?
A. You mean in the penalty phase?
Q. Yes.
A. I really just had to rely on his family, is what we had, his girlfriend and his mother, in developing mitigating circumstances.
Q. So if Coleman had come to you and said I was, in fact, there — but, by that, I mean, at the murder — and was truthful with you, assuming as the jury found he was, would your trial standards have been different?
A. Yeah. We would have prepared for the penalty phase and not concentrated so much on the guilt phase, if that were the issue.
Q. So your trial strategy was mandated and dictated by your client’s position?
A. That’s true
Q. And your trust and belief in him?
A. Right.
Q. Mr. Stokes, if your defense then was an alibi, I guess you wanted Mr. Coleman to be as normal of a human being as possible. You painted him as a — your strategy would be to normalize him or make him human.
A. At least in the penalty phase, you know. I think I said that he was not a killer, didn’t have the killer instinct. Even if they believed that he was there in Pensacola and he was this Mad Max, he couldn’t kill Amanda Merrill. He cut her throat, but he stopped before he got to the jugular, and that would show that *1220 he was not the killer, that he was not capable of that.
Stokes further testified that in another case he tried where innocence was not an issue, he prepared for the penalty phase by investigating the defendant’s background and presenting substantial mitigation, but “[i]n this case, because he had the alibi defense, it was not like he had confessed .... So we really concentrated on the guilt/innocence phase more than the penalty phase.” However, he also admitted that Coleman denied having the alias “Mack” or “Max,” but Cassandra Pritchett later told Stokes to ask for “Mack George” because that was Coleman’s nickname. Despite this revelation, Stokes testified that he was convinced Coleman was innocent and indicated he had no reason to believe he needed to pursue mitigation for the penalty phase.
In addition, Stokes testified that “he did not believe that presenting mitigating evidence of the Coleman’s childhood and background or mental state would have made a difference to the Court.” However, Stokes’ belief was misguided. In Tedder, 322 So.2d at 910, we made clear that the focus of the test is on the reasonableness of the jury recommendation, not on the judge’s determinations or personal inclinations. This Court reemphasized the focus of the test in Williams v. State, 987 So.2d 1, 11 (Fla.2008) (finding the trial court’s subjective prejudice analysis was legally flawed), and in Hall v. State, 541 So.2d 1125, 1128 (Fla.1989).
During the penalty phase, Stokes attempted to show that Coleman, even if at the scene of the crime, was not a murderer because he was unable to kill Merrell. To do so, Stokes claimed that he made a strategic decision not to present mitigation that would put Coleman in a bad light or make him appear to be capable of murder. Stokes believed this strategy was successful because the jury recommended life. However, this Court has “repeatedly observed that residual doubt is not an appropriate mitigating circumstance.” Darling v. State, 808 So.2d 145, 162 (Fla.2002) (citing Preston v. State, 607 So.2d 404, 411 (Fla.1992) (rejecting doubt as an appropriate mitigator); King v. State, 514 So.2d 354, 358 (Fla.1987) (same)).
The postconviction court denied Coleman’s ineffective assistance claim. In its order denying relief, the postconviction court found, in pertinent part:
In his second subclaim, the Defendant alleges that defense counsel failed to investigate “first and second stage evidence.” Specifically, the Defendant alleges that counsel was ineffective for failing to conduct an adequate pretrial investigation. At the evidentiary hearing, the Defendant’s trial counsel, Mr. Stokes, testified that he conducted “a lot of depositions”, and went to Miami and personally talked with all of the alibi witnesses provided by the Defendant. Mr. Stokes also testified that he spoke with the Defendant’s family about the Defendant’s past and background in Liberty City. The Defendant has failed to show how his counsel’s preparation was deficient, and fails to allege that there was a reasonable probability that the outcome would have been different had counsel prepared or investigated more. Accordingly, the Defendant is entitled to no relief on this claim.
In his third subclaim, the Defendant alleges that defense counsel was ineffective for failing to present mitigating evidence or evidence contradicting the State’s aggravating circumstances. At the evidentiary hearing, Mr. Stokes testified that his trial strategy was to focus on the guilt phase, and to paint the Defendant as a normal individual who was not capable of murder and not the *1221 killer. Mr. stokes testified that in his professional opinion, presenting the defendant’s “Liberty City background and all of the drugs ... would lead the jury to believe he was capable of it.” Further, Mr. Stokes testified that because the jury recommended against the death penalty, he believed his strategy worked. Mr. Stokes testified that he did not believe that presenting mitigating evidence of the Defendant’s childhood and background or mental state would have made a difference to the Court. Strategic decisions made by counsel which are reasonable under the norms of professional conduct do not constitute “ineffective assistance of counsel.” See Schwab v. State, 814 So.2d 402 (Fla.2002). Furthermore, a strong presumption exists that the challenged action constitutes sound trial strategy on the part of the defense. “[Djefense counsel’s strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected.” Spencer [v. State ], 842 So.2d [52] at 62 [ (Fla.2003) ]. The Court finds that the Defendant has not overcome this presumption and shown that trial counsel’s performance was unreasonable.
[[Image here]]
Fifth, the Defendant alleges that defense counsel was ineffective for failing to request a mental health expert on behalf of the Defendant. At the eviden-tiary hearing, Mr. Stokes testified that he believed the Defendant was “very intelligent”, streetwise, and mentally competent. Accordingly, Mr. Stokes, based upon his assessment of the Defendant, decided that calling a mental health expert to testify was not necessary.
Based upon the defendant’s trial testimony and performance under cross-examination, as well as Mr. Stokes’ testimony that he believed the Defendant was bright, competent and intelligent, the Court finds that the Defendant has failed to meet his burden of showing that counsel’s performance was deficient in any way. See Strickland v. Washington, 466 U.S. at 689 [104 S.Ct. 2052] (1984) (holding that Courts should “eliminate the distorting effects of hindsight” in evaluating an attorney’s performance).
In the instant case, it is clear that Coleman’s trial counsel failed to conduct any investigation into possible mitigation. A reasonable investigation in Coleman’s case would have revealed substantial mitigation. Had Stokes performed a reasonable investigation and uncovered the abovemen-tioned mitigation, he would have been compelled to “explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.” Rompilla v. Beard, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (quoting 1 ABA Standards for Criminal Justice § 4-4.1 (2d ed. Supp. 1982)).
Contrary to the State’s argument, it is also clear that Stokes’ preparation for the penalty phase did not overlap with his preparation for the guilt phase. Although Stokes did travel to the Florida Department of Law Enforcement and to Miami to depose people in relation to the guilt phase, he did not attempt to elicit information regarding mitigation during any of the depositions. Stokes testified as to the extent of the inquiries he made to Coleman’s family regarding mitigation:
Q. .When you spoke with his family in Miami or by telephone, what inquiries did you make about his history in terms of potential developmental disabilities?
A. The only thing I could recall is just growing up in Liberty City which is enough. That’s probably the most hor *1222 rendous place I’ve ever been. They’ve got barbed wire around all the businesses and, you know, I don’t blame anybody for doing anything to get out of Liberty City. And certainly that would lead to some problems, but I don’t know of anything specific.
The record demonstrates that Stokes spoke with Coleman’s mother and girlfriend only in relation to the guilt phase alibi. At the 2001 postconviction eviden-tiary hearing, defense counsel asked Coleman’s mother, Leverson, whether Stokes ever inquired about “all the questions that [defense counsel] asked a few minutes ago on direct exam about Michael’s childhood, and all the other different things,” to which Leverson responded, “No, ma’am.”
The State contends that Stokes’ failure to conduct an investigation was reasonable because, pursuant to his alibi defense and his maintenance of innocence, Coleman did not provide Stokes with any mitigation, and such mitigation may have been harmful to Coleman’s case. It is certainly true that “[t]he reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052. Trial counsel’s duty to investigate can be affected by the defendant’s conduct, “when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.” Id.; see also Rose v. State, 617 So.2d 291, 294-95 (Fla.1993) (finding trial counsel was not ineffective for failing to call family members where defendant told counsel that he had not had contact with his family for a number of years and that his family’s testimony would not be helpful). However, in the instant case, the record is devoid of any indication that Stokes ever inquired about Coleman’s past or possible mitigation. Admittedly, Stokes focused on the guilt phase and did not investigate any mitigation evidence. It is not clear that Coleman was even aware that his background information would be relevant or helpful to his case or that Coleman would have known what type of information to disclose to Stokes.
Moreover, in the cases cited by the State, the defendant either actively and intentionally concealed potential mitigation or ordered trial counsel not to conduct a penalty phase investigation. See Schriro v. Landrigan, 550 U.S. 465, 475, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) (“If Landri-gan issued such an instruction [to “his counsel not to offer any mitigating evidence”], counsel’s failure to investigate further could not have been prejudicial under Strickland.”); Reed v. State, 640 So.2d 1094, 1097 (Fla.1994) (“[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.”) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052); Bryan v. State, 748 So.2d 1003, 1007 (Fla.1999) (finding Bryan’s ineffective assistance of counsel claim was properly denied because he failed to provide his counsel with the mitigating facts). In contrast to the aforementioned cases, the record in the instant case does not reflect that, at any time, Coleman actively concealed mitigating factors or that he instructed Stokes not to pursue an investigation of mitigation. Rather, Stokes’ conduct likely precluded Coleman from realizing that such information might be helpful.
This Court has found ineffective assistance of counsel where trial counsel failed to conduct a reasonable investigation or failed to present mitigation absent waiver. *1223 See Hurst v. State, 18 So.3d 975, 1010-15 (Fla.2009) (finding ineffective assistance of counsel where trial counsel failed to conduct a reasonable investigation into mitigation and, despite counsel’s assertion that his decision not to present any mitigation was strategic, finding that there was no reasonable basis for not presenting the mitigation); Williams, 987 So.2d 1 (finding that defense counsel rendered ineffective assistance when he failed to present mitigation, that he literally had in his hand, to the judge who had already overridden jury recommendations of life for Williams’ code-fendants); State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002) (“[T]he obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated— this is an integral part of a capital case.”); Deaton v. Dugger, 635 So.2d 4 (Fla.1993) (finding deficiency in the penalty phase where trial counsel did not properly investigate and prepare for the penalty phase and presented no mitigation whatsoever); Mitchell v. State, 595 So.2d 938, 942 (Fla.1992) (trial counsel rendered ineffective assistance when he failed to prepare for the penalty phase because he thought he would win at the guilt phase); State v. Lara, 581 So.2d 1288, 1289 (Fla.1991) (trial counsel rendered ineffective assistance of counsel when he “virtually ignored the penalty phase of the trial”). The United States Supreme Court has made similar findings. See Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Wiggins, 539 U.S. 510, 123 S.Ct. 2527; Rompilla, 545 U.S. at 393, 125 S.Ct. 2456. The Eleventh Circuit has also made a similar finding that is persuasive in the instant case. See Hardwick v. Crosby, 320 F.3d 1127, 1186 n. 208 (11th Cir.2003) (finding deficient performance and noting that, with regard to Strickland, “[w]e have clarified, however, that ignorance of available mitigation evidence, such as family background, precludes counsel’s strategic-decision reasoning and constitutes ineffective assistance of counsel”).
Coleman raised an ineffective assistance of counsel claim regarding Stokes’ failure to have a mental health expert evaluate Coleman as his fifth subclaim. At the 2001 postconviction evidentiary hearing, Stokes testified that he did not seek an expert opinion regarding a possible mental or medical condition because he made the following observations that Coleman was (1) intelligent, (2) streetwise, (3) able to communicate, (4) bright, and (5) able to remember things. However, had Stokes conducted a reasonable investigation, he would have learned that Coleman suffered from various mental health issues. Even Dr. Larson, the State’s expert witness during the postconviction proceedings, agreed that Coleman suffered from polysubstance abuse and that Coleman was an abused or neglected child. Dr. Larson stated, “I have no doubt that this man had a very unfortunate childhood and that he very likely had insults to his brain. He’s certainly at risk for a certain amount of or-ganicity.”
In the event that Stokes had actually performed an investigation, he would have been entitled to make strategic decisions in deciding whether to present some or all of the potential mitigation. Here, the record shows that Stokes made his decision to not present any mitigating evidence prior to conducting an investigation and prior to discovering whether any worthwhile mitigation existed. Thus, Stokes was deficient in failing to investigate and uncover readily available mitigation evidence regarding Coleman. Under these circumstances, we conclude that Coleman has demonstrated that Stokes rendered deficient performance under Strickland and we find that the postconviction court erred in finding otherwise.

*1224
Prejudice

The postconviction court found that Coleman failed to demonstrate deficiency and thus did not conduct a prejudice analysis. Coleman now argues that he was prejudiced by Stokes’ deficient performance because the presentation of mitigation would have precluded the judge from overriding the jury’s recommendation of life. We agree.
This Court has repeatedly held that a defendant cannot demonstrate prejudice for counsel’s failure to present mitigation to the jury, as opposed to the judge, when the jury recommended a life sentence. See Williams, 987 So.2d at 11 (“Williams acknowledges that the jury returned a life recommendation, and hence he cannot demonstrate prejudice for his counsel’s decision to fail to present this evidence to the jury. We agree.”); Lusk v. State, 498 So.2d 902, 905 (Fla.1986) (“[T]he jury’s recommendation [of life] cannot be alleged to have been produced by counsel’s ineffectiveness.”); Buford v. State, 492 So.2d 355, 359 (Fla.1986) (“Appellant’s contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase of the trial is repudiated by the fact that the jury recommended life in this case.”). However, this Court has found prejudice where trial counsel failed to present mitigating evidence to the judge and such evidence would have precluded the judge from overriding the jury recommendation. Williams, 987 So.2d at 14 (vacating Williams’ death sentence after finding that trial counsel was ineffective for failing to present mitigation that would have precluded the jury override to the judge).
This Court first articulated the proper standard for determining whether a jury override is permissible in Tedder. There, we held, “A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ.” 322 So.2d at 910. The “reasonable basis” analysis must focus on finding support for the jury’s recommendation and does not demand that the judge agree with the jury’s conclusion. Weaver v. State, 894 So.2d 178, 197 (Fla.2004).
Thus, this issue turns on whether the mitigating evidence that was presented at the 2001 postconviction evidentiary hearing would have provided a reasonable basis for the jury’s recommendation of life. Here, Coleman must show that counsel failed to present evidence which would support a life sentence and constitute “a reasonable basis in the record to support the jury’s [life] recommendation.” Stevens v. State, 552 So.2d 1082, 1085 (Fla.1989); see Ramirez v. State, 810 So.2d 836 (Fla.2001).
At the 2001 postconviction evidentiary hearing, Coleman presented substantial mitigation that revealed that Coleman (1) came from an impoverished background; (2) had an unstable childhood; (3) had a poor relationship with his father; (4) was traumatized by the loss his father at a young age; (5) was traumatized by the loss of his half-brother; (6) suffered from negative experiences, such as riots and violence, at a young age; (7) has an erratic school record and history of special education placement; (8) has a long history of substance abuse; (9) was molested as a child; (10) received a severe head injury at the age of eighteen; and (11) suffers from mental health and illness deficiencies. This Court has repeatedly recognized the importance and significance of this kind of mitigation. See Williams, 987 So.2d at 14; Torres-Arboleda v. Dugger, 636 So.2d 1321 *1225 (Fla.1994); Heiney v. State, 620 So.2d 171, 174 (Fla.1993); Stevens, 552 So.2d at 1082. This Court has also repeatedly recognized each of the mitigating factors above as being valid mitigation. See Orme v. State, 896 So.2d 725, 732 (Fla.2005); Davis v. State, 875 So.2d 359, 372 (Fla.2003); Arbelaez v. State, 775 So.2d 909, 912 (Fla.2000); Miller v. State, 770 So.2d 1144, 1150 (Fla.2000); Malm v. State, 714 So.2d 391, 400-01 (Fla.1998); Jackson v. State, 704 So.2d 500, 506-07 (Fla.1997); Marquard v. State, 641 So.2d 54, 56 n. 2 (Fla.1994); Foster v. State, 614 So.2d 455, 461 (Fla.1992); Heiney v. Dugger, 558 So.2d 398, 400 (Fla.1990); Brown v. State, 526 So.2d 903, 907-08 (Fla.1988); Huddleston v. State, 475 So.2d 204, 206 (Fla.1985); Norris v. State, 429 So.2d 688, 690 (Fla.1983); Mann v. State, 420 So.2d 578, 581 (Fla.1982).
It takes more than a difference of opinion as to the validity and weight of the evidence presented in aggravation and mitigation to justify a jury override. Holsworth v. State, 522 So.2d 348 (Fla.1988). In determining whether to override a jury’s recommendation of a life sentence, the mitigation evidence should be viewed in the light most favorable to the defendant. The trial court must then consider whether the mitigation evidence could serve as a reasonable basis for a life recommendation. Weaver, 894 So.2d at 197. Here, if Stokes had properly presented the aforementioned mitigating evidence, the trial judge would have had to view it in light most favorable to the defendant and would have been precluded from overriding the jury. Stokes’ failure to investigate and present the mitigation evidence deprived Coleman of a reliable penalty phase proceeding, Asay, 769 So.2d at 985, and “so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.” Maxwell, 490 So.2d at 932.
Stokes’ failure to present this evidence below, and thereby ensure its presence in the record, also precluded this Court from being able to make a fully informed decision regarding the disposition of this case on direct appeal. “Under our caselaw, it is the existence of such evidence of mitigation in the record that operates to provide a basis for a life recommendation and, hence, preclude a trial judge’s override of the jury’s decision.” Williams, 987 So.2d at 14. On direct appeal, we upheld the jury override because “the potential mitigating evidence presented in the instant case is of little weight and provides no basis for the jury’s recommendation.” Coleman, 610 So.2d at 1287. This Court explained, “We reach this conclusion, even though we have struck one of the aggravators found by the trial court, because there is no reasonable likelihood that the trial court would conclude that the mitigating evidence outweighed the four remaining aggravators.” Id. However, the dissent disagreed, stating, “I do not believe that the jury recommendation of life imprisonment should be disregarded. Based on the circumstances of the killings, as well as the evidence of nonstatutory mitigation, I cannot say that no reasonable person could have recommended a life sentence here.” Id. at 1288 (Barkett, C.J., concurring in part and dissenting in part). Thus, it is clear that Stokes’ failure to investigate, develop, and present the mitigation evidence not only undermined confidence in the outcome of the trial proceedings, but also precluded this Court from making a proper disposition of the case on direct appeal.
The only remaining issue at this point is whether we should remand this case to the trial court for resentencing before the judge or before a newly empanelled jury, or whether we should remand this case to the trial court for imposition of life sen *1226 tences on the first-degree murder counts. In similar postconviction cases involving reversals of jury overrides under Tedder, we have been inconsistent in our approach — at times remanding to the trial court for resentencing before the judge[11] or remanding to the trial court for imposition of a life sentence.[12] For reasons explained below, we now resolve this inconsistency by receding from our prior decisions where we remanded to the trial court for resentencing,[13] and we reaffirm our more recent decision where we remanded to the trial court for imposition of a life sentence.[14]
We again emphasize that the proper standard in a jury override case is as follows: the trial court is precluded from overriding the jury’s life recommendation unless the court can state that “the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ.” Tedder, 322 So.2d at 910. To demonstrate ineffective assistance of counsel in an appeal from a denial of postconviction relief, the defendant must establish that counsel’s performance was deficient and must also establish prejudice. To establish prejudice in a jury override case, this Court has explained: “The proper standard is whether a jury recommending life imprisonment would have a reasonable basis for that recommendation. If so, the trial judge could not override the jury’s recommendation.” Williams, 987 So.2d at 11 (quoting Hall, 541 So.2d at 1128).
Because it is this Court that makes the ultimate determination under Tedder regarding whether there is a reasonable basis for the jury’s life recommendation, we conclude that a new sentencing proceeding before a trial court is unnecessary in postconviction jury override cases, just as it is unnecessary in direct appeal jury override cases.[15] Indeed, as in direct *1227 appeal cases, it would be pointless to remand for a new sentencing proceeding before a judge or a newly empanelled jury after we have already conducted our own definitive review and concluded that a reasonable basis exists for the life recommendation. At that point, the inquiry is ended. Once a defendant has demonstrated that the mitigation presented would have provided a reasonable basis for the jury recommendation, the defendant is entitled to a life sentence. Accordingly, we now hold that the proper course — and the course that we will follow in future postconviction jury override cases in which the mitigation presented at the evidentiary hearing would have precluded a jury override — is to remand the case to the trial court for imposition of a life sentence. By eliminating the resentencing proceeding on remand, as well as any subsequent appeal, this approach will promote the timely resolution of these cases, and it will foster uniformity in this area of the law.
In the present case, we affirm the post-conviction court’s denial of rule 3.850 relief with respect to the first-degree murder convictions, but we reverse the court’s denial of relief with respect to the death sentences. We vacate Coleman’s death sentences and remand for imposition of a life sentence on each of the first-degree murder counts. The trial court, in its discretion, may impose the sentences concurrently or consecutively. See Williams, 987 So.2d at 16 (“Nothing in this decision should be construed to prohibit the trial court from considering the imposition of consecutive sentences for the various crimes and convictions involved.”). We decline to address Coleman’s other penalty phase claims. We further find that Coleman’s non-penalty phase claims are without merit, as are his habeas claims. We deny the petition for writ of habeas corpus.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. Coleman raised the following issues on direct appeal: (1) the trial court erred in refusing to sever his trial from those of his co-defendants, (2) the trial court’s refusal to answer the jury’s question regarding whether Coleman’s DNA was found on the vaginal swabs taken from the sexual battery victims constituted reversible error, (3) the State exercised two peremptory challenges in a discriminatory manner and the trial court abused its discretion in accepting the State's explanations regarding those challenges, (4) the trial court erred in failing to suppress the testimony of Amanda Merrell, Darlene Crenshaw, and Arabella Washington because their in-court identifications were based on their tainted out-of-court identifications, and (5) the trial court erred in overriding the jury’s recommendation of life imprisonment.

.The trial court found the existence of the following aggravating circumstances: (1) the defendant was previously convicted of a another capital felony or a felony involving the use or threat of force; (2) the capital felonies were committed while the defendant was engaged in the commission of a robbery, sexual battery, burglary, and kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the capital felony was especially heinous, atrocious, and cruel (HAC); and (5) the murders were committed in a cold, calculated, and premeditated (CCP) manner.

. The trial court found that the "defendant has maintained close family ties throughout his life and has been supportive of his mother.”

. In the 1997 motion, Coleman raised the following issues: (1) Coleman was denied his right to conflict-free, effective postconviction counsel; (2) Coleman was denied his right to effective representation by the lack of funding available to fully investigate and prepare his postconviction pleadings, understaffing, and the unprecedented workload of Capital Collateral Representative (CCR); (3) Coleman was denied his rights to due process and *1215 equal protection because access to files and records was not provided; (4) Coleman’s convictions were materially unreliable due to the cumulative effect of ineffective assistance of counsel, withholding impeachment and exculpatory material, and improper rulings of the trial court; (5) the existence of newly discovered evidence rendered Coleman’s convictions materially unreliable; (6) Coleman was deprived of his due process rights because the State withheld evidence that was material or exculpatory in nature or presented false or misleading evidence; (7) counsel was ineffective during voir dire; (8) Coleman was denied a fair trial because of prosecutorial misconduct and counsel was ineffective for failing to object to the prosecutor’s improper statements; (9) counsel was ineffective for failing to adequately investigate and prepare the defense case; (10) counsel was ineffective for failing to present evidence about Coleman’s mental state to the judge and jury; (11) an adequate mental health investigation was never performed on Coleman in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (12) the procedural and substantive errors in Coleman’s case amounted to harmful, fundamental error; (13) Coleman was denied effective assistance of counsel during the sentencing phase; (14) Coleman was absent from critical stages of the trial; (15) trial counsel was ineffective for failing to object when the trial court improperly shifted the burden to Coleman to prove that death was inappropriate and employed a presumption of death; (16) Florida’s capital sentencing statute is vague and over-broad and counsel was ineffective in failing to object; (17) Coleman’s death sentence is fundamentally unfair and unreliable; (18) Coleman was denied effective assistance of counsel because of the rules prohibiting his lawyer from interviewing jurors to determine if a constitutional error occurred; (19) the prosecutor’s argument regarding aggravating circumstances was vague and overbroad and defense counsel was ineffective for failing to object; (20) Coleman is innocent of the death penalty; (21) execution by electrocution is cruel and unusual punishment; (22) Florida’s capital sentencing statute is unconstitutional; (23) Coleman was denied a fair and impartial jury; (24) the trial court improperly failed to consider mitigation clearly set out in the record; (25) the trial court’s sentencing order did not reflect independent weighing or reasoned judgment; (26) Coleman was denied a proper direct appeal because counsel was ineffective in securing important information into the record; (27) the Florida Supreme Court failed to conduct a proper harmless error analysis after striking an aggravating factor; (28) Coleman was denied a fair trial due to shackling and excessive security measures and counsel was ineffective for failing to object; (29) the judge and jury relied on misinformation in sentencing Coleman to death; (30) Coleman’s death sentence is impermissi-bly predicated on an automatic aggravating circumstance.

. In the 2000 motion, Coleman raised the following issues: (1) restrictions placed on Coleman’s attorney by the Registry Act and the contract for capital collateral counsel violated Coleman's right to counsel, due process, and equal protection; (2) Coleman was denied access to records in violation of Chapter 119, Florida Statutes; (3) the public records restrictions violate Coleman’s due process and equal protection rights and deny him effective assistance of counsel and access to courts; (4) the outcomes of Coleman’s guilt, penalty, and sentencing phases were materially unreliable; (5) there was newly discovered evidence; (6) the State withheld material and exculpatory evidence or presented misleading evidence, or both; (7) the security measures taken during trial denied Coleman a number of rights; (8) trial counsel rendered ineffective assistance of counsel; (9) Coleman did not receive mental health assistance in violation of Ake; (10) the execution of Coleman would constitute cruel and unusual punishment; (11) the trial court improperly instructed the jurors on the expert testimony standard; (12) Coleman was improperly charged with, and the juiy was improperly instructed on, attempted felony-murder; (13) the trial court erred in finding the prior violent felony aggravator; (14) Coleman’s sentence is unconstitutionally based on an automatic aggravator; (15) Florida’s CCP statute is unconstitutionally vague and over-broad; (16) the finding of the HAC aggravator was erroneous; (17) Florida statutes and jury instructions unconstitutionally shifted the burden to Coleman to prove death was an inappropriate sentence; (18) Florida’s capital sentencing statute is unconstitutional; (19) Coleman’s rights were violated because *1216 his attorneys were prohibited from interviewing the jurors for juror misconduct; (20) juror misconduct occurred during trial; (21) Coleman was deprived of a fundamentally fair trial due to the cumulative effect of the procedural and substantive errors.

. Huff v. State, 622 So.2d 982 (Fla.1993).

. In the 2004 second amended motion, Coleman alleged that he was denied his right to trial by jury during the penalty phase.

. In the 2005 motion, which is part of the initial motion, Coleman raised the following issues: (1) Coleman’s death sentences violate the prohibition against cruel and unusual punishment, (2) the procedure for determination of mental retardation as provided by Florida Rule of Criminal Procedure 3.202 violates the United States and Florida constitutions, and (3) Coleman is mentally retarded and therefore his execution is forbidden by section 921.137, Florida Statutes (2001), and by Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. Coleman now raises the following seven claims: (1) the postconviction court erred in denying Coleman’s penalty phase ineffective assistance of counsel claim; (2) the postcon-viction court erred in excluding evidence and testimony concerning defense counsel’s intoxication; (3) Coleman’s death sentence is disproportionate; (4) Coleman’s death sentence is unconstitutional under Atkins and the trial court erred in failing to conduct a competency hearing; (5) the trial court erred in denying Coleman's first and second motions to disqualify the judge; (6) the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (7) Coleman was improperly charged and convicted of attempted felony-murder and it was error to instruct the jury on attempted felony-murder.

. In his habeas petition, Coleman raises the following three issues: (1) appellate counsel rendered ineffective assistance of counsel, (2) executing Coleman constitutes cruel and unusual punishment, and (3) Coleman’s attempted first-degree murder conviction entitles him to habeas relief.

. See, e.g., Torres-Arboleda, 636 So.2d at 1326 ("[W]e vacate Torres-Arboleda’s sentence of death and remand for a resentencing hearing before the judge. It is unnecessary to conduct the hearing before a jury as Torres-Arboleda is entitled to the benefit of the previous jury’s life recommendation.”); Heiney, 620 So.2d at 174 (”[W]e vacate Heiney’s sentence of death and remand for a resentencing hearing. It is unnecessary to conduct the hearing before a jury because Heiney is entitled to the benefit of the previous jury’s life recommendation.”); Stevens, 552 So.2d at 1088 ("The denial of the rule 3.850 motion with respect to Stevens’ sentence is reversed, and we vacate the sentence and remand for sentencing before a new trial judge. It is unnecessary to conduct a sentencing proceeding before a newly empaneled jury as Stevens is to receive the benefit of the previous jury’s life recommendation.”).

. See Williams, 987 So.2d at 16 ("we remand with directions that defendant's sentences be reduced to life.”).

. We recede from Torres-Arboleda, 636 So.2d at 1326, Heiney, 620 So.2d at 174, Stevens, 552 So.2d at 1088, and Hall, 541 So.2d at 1128, and their progeny.

. See Williams, 987 So.2d at 16.

. See, e.g., Weaver, 894 So.2d at 202 (”[W]e affirm Weaver’s conviction but remand to the trial court with instructions to enter a sentence of life imprisonment without the possibility of parole."); San Martin v. State, 717 So.2d 462, 472 (Fla.1998) (”[W]e affirm San Martin’s convictions but vacate his death sentence and remand for imposition of a life sentence without the possibility of parole in accordance with the jury's recommendation.”); Mahn, 714 So.2d at 403 (”[W]e affirm Mahn’s first-degree murder convictions, but remand with directions that his sentence for Debra Shanko’s murder be reduced to a life sentence without eligibility for parole for twenty-five years.”); Marta-Rodriguez v. State, 699 So.2d 1010, 1013 (Fla.1997) (”[W]e affirm Marta-Rodriguez’s convictions and non-capital felony sentences, vacate his death sentences, and remand for imposition of two consecutive sentences of life imprisonment, each without the possibility of parole for twenty-five years.”); Jenkins v. State, 692 *1227 So.2d 893, 896 (Fla. 1997) ("We affirm the conviction of first-degree murder but vacate Jenkins’ death sentence and remand for imposition of life imprisonment without possibility of parole.”).